UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TIFFANY HOVIS, as dependent | § | |
| administrator of and on behalf of the | § | |
| ESTATE OF MATTHEW RAY MAXWELL, | § | |
| and MATTHEW RAY MAXWELL's heir(s)- | § | |
| at-law and wrongful death beneficiaries; and | § | |
| DONNA DIAZ, individually, | § | CIVIL ACTION NO. _____ |
| | § | |
| Plaintiffs, | § | JURY DEMANDED |
| | § | |
| v. | § | |
| | § | |
| WICHITA COUNTY, TEXAS; and | § | |
| CORRHEALTH, PLLC A/K/A | § | |
| CORRHEALTH, | § | |
| | | |
| Defendants. | | |

## PLAINTIFFS' ORIGINAL COMPLAINT

> **Deathly ill pre-trial detainee Matthew Ray Maxwell horribly suffered and died an unnecessary and preventable death from a bowel obstruction during incarceration in the Wichita County jail as a result of Defendants' policies, practices, and/or customs.**



Table of Contents

I.    Introductory Allegations ........................................................................................3

    A.    Parties.........................................................................................................3

    B.    Jurisdiction and Venue...............................................................................5

II.    Factual Allegations ...............................................................................................6

    A.    Preliminary Statements ..............................................................................6

    B.    Matthew's Suffering and Death in the Wichita County Jail ...........................7

        1.    General Timeline .............................................................................7

        2.    Matthew's Suffering Seen on Video.................................................14

        3.    Texas Rangers Investigation ...........................................................19

        4.    Texas Commission on Jail Standards Investigation............................20

        5.    Custodial Death Report (Filed with Attorney General)......................21

        6.    Medical Records .............................................................................22

            a.    EMS Records .......................................................................22

            b.    Autopsy Report ...................................................................22

    C.    Liability of Wichita County and CorrHealth .............................................24

        1.    Introduction...................................................................................24

        2.    CorrHealth's Agreement and Partnership with Wichita County .........25

        3.    Non-Delegable Duties and Respondeat Superior ...............................33

        4.    Wichita County and CorrHealth Policies, Practices, and Customs .....36

        5.    TCJS Records Demonstrating County Practices and/or Customs .......39

        6.    Suffering and Death of Other Detainees ...........................................44

III.    Causes of Action ................................................................................................45

    A.    14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson* .....................................45

    B.    Remedies for Violation of Constitutional Rights...........................................47

    C.    Cause of Action Against Wichita County and CorrHealth Under 42 U.S.C. § 1983 for Violation of Constitutional Rights .................................................47

IV.    Concluding Allegations and Prayer ....................................................................50

    A.    Conditions Precedent ...............................................................................50

    B.    Use of Documents at Trial or Pretrial Proceedings .....................................50

    C.    Jury Demand ............................................................................................50

    D.    Prayer .......................................................................................................51

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiffs file this complaint and for cause of action will show the following.

I.      Introductory Allegations

A.      Parties

1.      Tiffany Hovis ("Ms. Hovis") sues as the dependent administrator of the Estate of Matthew Ray Maxwell, Deceased.  Tiffany Hovis, when asserting claims in this lawsuit as the dependent administrator, does so in that capacity on behalf of all wrongful death beneficiaries (including Donna Diaz, female minor N.J.M. [daughter of Matthew Ray Maxwell], and potentially male minor C.L.M [possible son of Matthew Ray Maxwell]). All people in the immediately preceding sentence, excluding Ms. Hovis, are collectively referred to herein as the "Wrongful Death Beneficiaries." Ms. Hovis asserts claims on behalf of and seeks all wrongful death and other damages available under law to the Wrongful Death Beneficiaries.  She also sues in that capacity asserting claims on behalf of the estate and all of Mr. Maxwell's heirs (currently including female minor N.J.M. [daughter of Matthew Ray Maxwell] and potentially male minor C.L.M [possible son of Matthew Ray Maxwell]). All people in the immediately preceding sentence, currently excluding Ms. Hovis, are collectively referred to herein as the "Claimant Heirs."  Ms. Hovis asserts claims on behalf of and seeks all survival and other damages available under law to the Claimant Heirs. Tiffany Hovis qualified as dependent administrator in Cause Number CCL2-PR2023-0097, in the County Court at Law No. 2 of Wichita County, Texas, in a case styled *Estate of Matthew Ray Maxwell, Deceased.*

2.      Plaintiff Donna Diaz ("Ms. Diaz") is a natural person who is the biological and legal mother of Matthew Ray Maxwell. Matthew Ray Maxwell is referred to herein at times as

"Mr. Maxwell," "Matthew," or the "decedent." Donna Diaz sues in her individual capacity and seeks all damages and remedies available to her as a wrongful death beneficiary and/or heir.

3.      Defendant Wichita County, Texas ("Wichita County" or "County") is a Texas county. Wichita County may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer, Honorable County Judge Jim Johnson, at 900 7th Street, Room 260, Wichita Falls, Texas 76301, or wherever Honorable County Judge Jim Johnson may be found. Service on such person is also consistent with the manner prescribed by Texas law for serving a summons or like process on a county as a Defendant, as set forth in Texas Civil Practice and Remedies Code Section 17.024(a). County acted or failed to act at all relevant times through CorrHealth, PLLC and County employees, agents, representatives, jailers, and/or chief policymakers, all of whom acted under color of state law at all relevant times, and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983). The County's and/or CorrHealth, PLLC's policies, practices, and/or customs were moving forces behind, and caused, were proximate causes of, and were producing causes of, constitutional violations and resulting damages (including death) referenced in this pleading.

4.      Defendant CorrHealth, PLLC a/k/a CorrHealth (sometimes referred to herein as "CorrHealth") is a Texas professional limited liability company. CorrHealth may be served with process by serving its registered agent, Michael T. Murphy, at its registered office, 1305 Hunters Glen, Royce City, Texas 75189, or wherever Michael T. Murphy may be found. Michael T. Murphy may also be served with process at 6303 Goliad Avenue, Dallas, Texas 75214. Such service is in accordance with Federal of Civil Procedure 4(h)(1)(A), which provides that service of process may be made in the manner prescribed by Rule 4(e)(1) for serving an individual. Rule

4(e)(1) provides that service on an individual may be made in the manner allowed by the law of the state in which the district court in which the federal case is filed is located. Service on the registered agent for service of process is provided by Texas law. In addition, CorrHealth may be served with process, pursuant to Rule (4)(h)(B), by delivering a copy of the summons and this complaint to an officer, or a managing or general agent, of CorrHealth, wherever any such person may be found. Thus, CorrHealth may also be served with process by serving its co-founder and president of operations, Victor Hutchinson, at 1305 Hunters Glen, Royce City, Texas 75189, or wherever Victor Hutchinson may be found. CorrHealth acted and/or failed to act at all relevant times, through its employees, agents, representatives, and/or chief policymakers, and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to vicarious liability law and law applicable to claims pursuant to 42 U.S.C. § 1983). CorrHealth acted at all times under color of state law, and its policies, practices, and/or customs were moving forces behind and caused constitutional violations and resulting damages (including death) referenced in this pleading.

   B.  Jurisdiction and Venue

  5.  The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. § 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statute(s) providing for the protection of civil rights. This suit arises under the United States Constitution and 42 U.S.C. § 1983. The court has personal jurisdiction over the County because it is a Texas county. The court has personal jurisdiction over CorrHealth because, including but not limited to, CorrHealth's minimum contacts with Texas are such that CorrHealth would expect to be subject to the court's jurisdiction. Venue is proper in the Dallas Division of the United States District Court for the Northern District of Texas, pursuant to 28 U.S.C. § 1391(b)(1).

Venue is proper in a judicial district in which any defendant resides, if all defendants are residents of the state in which the district is located. Both Defendants are residents of Texas, and Defendant CorrHealth has its primary office and place of business in, and is a resident of, Dallas, Texas. Therefore, CorrHealth has its primary office and principal place of business in the Dallas Division of the United States District Court for the Northern District of Texas.

## II.     Factual Allegations

### A.     Preliminary Statements

6.     Plaintiffs provide in factual allegations sections below the general substance of certain factual allegations.  Plaintiffs do not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations.  Rather, Plaintiffs intend that those sections provide Defendants sufficient fair notice of the general nature and substance of Plaintiffs' allegations, and further demonstrate that Plaintiffs' claims have facial plausibility.  Whenever Plaintiffs plead factual allegations "upon information and belief," Plaintiffs are pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.  Moreover, where Plaintiffs quote a document, conversation, or recording verbatim, or provide a person's name, Plaintiffs have done Plaintiffs' best to do so accurately and without any typographical errors. However, some typographical errors may still exist.

7.     Plaintiffs plead facts which give rise to, and thus assert, conditions of confinement claims. Conditions of confinement claims require no deliberate indifference on behalf of a governmental entity or governmental actor. In the alternative, Plaintiffs plead facts which give rise to episodic acts and/or omissions claims. Regardless, pursuant to United States Supreme Court authority, Plaintiffs need not assert in this pleading specific constitutional claims but rather must

merely plead facts which give rise to constitutional claims. Plaintiffs thus ask that the court apply the correct legal theories to the facts pled.

8.      Plaintiffs are not pleading their "best case" and will only be able to do so after conducting discovery.  Plaintiffs do not intend to "stand" on this pleading but will seek leave to amend as further facts are developed, or in the event any court determines that Plaintiffs' live pleading is any manner deficient.

B.      Matthew's Suffering and Death in the Wichita County Jail

1.      General Timeline

9.      Plaintiffs provide in this portion of the brief some general factual allegations, in a rough timeline, of the morning of April 1, 2022. Plaintiffs provide in another section below more specific facts about the horrendous suffering Matthew experienced, as a result of his bowel blockage, for at least six hours on the morning of April 1st concluding in his death.

10.      Matthew unnecessarily suffered for hours before his preventable death on or about April 1, 2022 as a result of being incarcerated in the County jail. Upon information and belief, the jail was located at 2815 Central Freeway East, Wichita Falls, Texas 76302. Defendants' policies, practices, and/or customs caused, were proximate causes of, were producing causes, and were moving forces behind Matthew's suffering and death and all other damages referenced in this complaint.  This section of the complaint provides only some material facts related to Matthew's suffering and death.   Plaintiffs set forth other material facts related to Matthew's suffering and death in other portions of this complaint.

11.      Matthew, 32 years old, was arrested on March 28, 2022 by a Wichita Falls Police Department officer. The officer had received a call about a suspicious person and located Matthew. The officer conducted a records check and found that Matthew had outstanding warrants. Matthew

was transported to and incarcerated in the County jail. Upon information and belief, Matthew was a pretrial detainee.

12.    CorrHealth electronic medical records, in CorEMR software, indicate that, on April 1, 2022, Matthew was experiencing pain. Specifically, records indicate that at 6:15 AM, Bonnie Shavers, upon information and belief a CorrHealth employee, learned that Matthew was experiencing severe pain when he woke up that morning, which he rated at a "10" on a scale of 1-to-10, in the right upper quadrant of his body, left upper quadrant of his body, and midline. Records also indicate that Matthew's 10-out-of-10 pain level was constant. Associated symptoms listed by Ms. Shavers were upper abdominal pain on both sides. A portion of a form for entry of vital signs, which the form required to be completed, was left blank. A note typed into a "general appearance" row read, "Unable to stand erect (PT WILL NOT STOP MOVING)." Pain was also induced with gentle abdominal palpitations in Matthew's upper bilateral quadrants, and pain was induced with Matthew walking.

13.    The records indicate that Matthew was constipated. The records fail to indicate that Matthew had been screaming in pain and was doubled over. It was apparent not only to trained medical personnel, but even non-trained laypeople, that Matthew did not need basic medication to cure stomach issues but instead to be taken to a local emergency room for evaluation through including but not limited to appropriate X-rays and/or CT scans, and ultimately life-saving surgery. People who are constipated, while experiencing discomfort, can generally continue to perform their normal tasks of daily living, including working and conducting other physical activity. This was not true with Matthew, as is further shown below, and it was evident to everyone who had knowledge of his condition.

14.     Matthew needed to resolve the bowel blockage which would cause severe pain for hours and ultimately his untimely death. However, instead of doing so, Ms. Shavers simply gave Matthew milk of magnesia. This amounted to no treatment at all for a serious medical condition resulting in screaming and being doubled over in pain. This would not have been a treatment provided by any reasonable person, including medical personnel and/or laypeople. All reasonable people having a friend or relative experiencing such symptoms would immediately seek medical treatment at a local hospital. If Defendants had done so, Matthew would have received anesthesia and ultimately surgery, resulting in significantly less suffering and his life being saved.

15.     At approximately 6:45 AM, Wichita County Sheriff's Office Corporal J. Price received a call from detention officer Joshua Jackson (# 4667) in L-pod regarding Matthew. Officer Jackson said that Matthew was in pain and doubled over in the shower. Officer Jackson said that he called "Medical," who was upon information and belief CorrHealth, and told Medical that Matthew was having stomach pain. Instead of responding, Medical told Officer Jackson to "put a sick call in."

16.     Approximately three minutes later, Corporal Price arrived at L-pod and went to the shower to talk to Matthew. Matthew was in the shower screaming and doubled over in pain. Corporal Price told Matthew that he would contact Medical again. Corporal Price then went to the officer station to contact medical/CorrHealth.

17.     Corporal Price spoke with LVN Josh Simpkins. He told LVN Simpkins that he knew that Officer Jackson had called about Matthew, but that Corporal Price wanted Medical to come and assess Matthew due to him being doubled over in pain and screaming. Josh, upon information and believe a CorrHealth employee, spoke with someone else in Medical and allegedly said it was not an emergency. He said that a sick call was already in place for Matthew to see a

doctor "in the morning." Corporal Price told LVN Simpkins that Corporal Price understood, but that Corporal Price felt that the situation had changed, and if someone was not going to do an assessment of Matthew, Corporal Price would call a medical emergency to L-pod. Thus, any medication supposedly provided to Matthew clearly was not working. Matthew had continued to get progressively worse, as was evident even to a non-medical layperson. Thus, it was evident to everyone in the jail who had contact with or knowledge about Matthew that he needed emergency medical treatment.

18.     LVN Simpkins then spoke with someone else in Medical. LVN Samantha Hall then joined the phone call. LVN Hall said that they were told by their bosses, upon information and belief higher-level and/or management employees at CorrHealth, that jailers could not threaten to call a medical emergency and in doing so, get a nurse to go to the pod. Corporal Price told them in substance, "Fine," and that he was going to get Matthew dressed and bring him down to Medical. Corporal Price then hung up the phone. Corporal Price realized Matthew's dire state and wanted someone to do something about it. When medical personnel failed or refused to do so, he decided to take action. Corporal Price took Matthew to Medical, which required some assistance for Matthew to be able to walk. Once in Medical, Detention Officer Caesar Cabrera (#4584) took over for Corporal Price. Corporal Price returned to the report room to conduct shift change. Upon information and belief, shift change occurred at 7:00 AM. Matthew was moved to and held in medical segregation cell X-105 at some point, which is where he would suffer for several hours and die. Jailers and medical personnel could easily see into the cell, as there was a vertical window in the cell door, and a large vertical window next to the cell door.

19.     Further, provision of milk of magnesia constituted no medical treatment at all, because Matthew vomited up the medication. Detention officer Georgeana Latham (#4677) was

working in the medical segregation unit at the jail on April 1, 2022. She related that, at approximately 7:40 AM, Matthew had been brought to medical segregation complaining of severe stomach pain. She noted that he was given milk of magnesia, but that he vomited it up shortly thereafter. Detention officer Kameron Young (#4454) was working the same shift as detention officer Latham. Detention officer Young confirmed that Matthew had been complaining of severe stomach pain. Officer Latham also confirmed that, after administration of milk of magnesia, Matthew vomited up the medication.

20.    Nicole Hooper indicates that, at approximately 8:10 AM, she was asked to evaluate Matthew for abdominal cramping. Matthew was standing in his cell, naked. This was another indicator of the severe pain and discomfort he was experiencing. As more specifically described elsewhere in this pleading, Matthew was removing clothes, manipulating clothing, manipulating a blanket, and doing anything he could to try to dull and/or resolve the excruciating pain. According to one or more other witnesses, Matthew was becoming worse, not getting better. This was likely roughly one-and-a-half to two hours or so after he had been given milk of magnesia (which he vomited up) and had been found doubled over screaming in pain. Ms. Hooper saw feces smeared on the bed mat. Matthew's blood pressure was now dangerously high, at 180/110.

21.    All reasonable medical personnel and all reasonable laypersons would have called for EMS to have Matthew transported to a local emergency department for treatment. Matthew had been screaming, doubled over in pain, and now his blood pressure was in an emergency treatment range. Instead, upon information and belief to avoid expense which would be incurred by CorrHealth and/or County, blood pressure medication was administered. Matthew was also provided an enema and additional stomach medication. Detention officer Kameron Young indicated that, after giving Matthew the blood pressure medication and additional stomach

medication, as he had done with the milk of magnesia, Matthew vomited up the medication. Thus, there was no doubt that Matthew was so sick that he could not keep medication down, and that his body was unable to use and/or synthesize medication given to him. Since Matthew vomited up all medication provided to him, the medication provision constituted no medical treatment at all. It continued to be obvious that Matthew needed emergency medical treatment.

22.     Interestingly, this entry by Ms. Hooper was not made until 1:37 PM, well after Matthew was deceased. It should have been made shortly after the alleged occurrence at 8:10 AM that morning. The failure to do so violated all known medical and correctional medicine standards. The late entry also gives rise to an inference that information contained in it may have been drafted in a light most favorable to Defendants and in a manner not entirely candid.

23.     Further, the increased blood pressure would had set off alarm bells in any person. Matthew's blood pressure was 130/66 at 6:15 AM on April 1, 2023, and it was 111/76 on March 28, 2022 at 2:44 PM. Matthew's blood pressure was thus typically normal. It increased after he began experiencing pain at a level of 10-out-of-10. According to medical records, Matthew's blood pressure at 7:25 AM on April 1, 2022 was 188/120. Matthew was in such pain at the time, according to medical records, that medical personnel were unable to obtain his heart rate due to Matthew being "too restless." This was due to Matthew's severe pain. Matthew could not help himself.  Matthew undoubtedly wanted to resolve his pain and obtain treatment, so he would not have been intentionally restless to avoid his heart rate being taken. If Matthew were that restless as a result of his medical condition and pain, he should have been transported to a local emergency room.

24.     Officer Latham and Officer Young confirmed, contrary to a meal log, that Matthew refused his lunch tray at roughly 11:44 AM and was still complaining about abdominal pain.

Officer Latham called CorrHealth personnel at approximately noon to tell them that Matthew could not breathe and was coughing up blood.

25.    Approximately six hours after Defendants became aware that Matthew was suffering with pain at a level of 10-out-of-10, doubled over, and screaming, Officer Latham finally called a medical emergency. This occurred at approximately 12:18 PM, to the medical segregation cell in which Matthew was incarcerated. Matthew had shortness of breath, and medical personnel could see through the cell observation window that Matthew was vomiting clear liquid onto the floor. It was too late for Matthew, as he would be deceased in a matter of minutes. Before personnel entered Matthew's cell, Matthew slumped over and became unresponsive. CPR was started shortly thereafter, and Ms. Gallardo said, "Medical emergency, starting CPR, call 911 now." The AED device did not advise a shock. It was far too late for Matthew to receive medical treatment.

26.    Another portion of CorrHealth's medical records, completed and/or entered at roughly 2:57 PM on April 1, 2022, regarding Matthew's death occurring between roughly 12:13 PM and 12:18 PM, provided further evidence of Matthew's immediate death after roughly six hours of excruciating pain. After Matthew slumped over and lost consciousness, a nurse immediately checked for his pulse. The nurse found no blood pressure reading. Matthew had no pulse. Matthew had no respiration. Matthew was deceased.

27.    Matthew died at the jail. Upon information and belief, jailers at the scene wanted to "call" the fact that Matthew was deceased at the jail but were not allowed to do so by one or more supervisors. Supervisors apparently wanted Matthew's death to be "called" at the hospital to attempt to avoid liability for his suffering and death. This is further direct and circumstantial evidence that Matthew's serious medical needs were ignored, and/or he was intentionally treated improperly as a result of, potentially in part, financial pressures to minimize the cost of providing

detainee medical care. The minimal provision of medication, which Matthew vomited up, when considered in light of his suffering described in this pleading, was grossly incompetent, clearly inadequate, and amounted to intentionally treating him improperly and/or providing no care at all.

2.    Matthew's Suffering Seen on Video

28.    Plaintiffs were able to obtain video recordings of the medical segregation cell in which Matthew was incarcerated, for the last several hours of his life. There were no audio recordings included. Upon information and belief, one or more employees of Defendant(s) were able to see the video feed for the entire several-hour time period described below, and they could have taken action based on it. Unfortunately, the video recordings do not contain time stamps. Therefore, in this section of the pleading, Plaintiffs address what occurred during roughly 30-minute segments over the last several hours of Matthew's life. Plaintiffs refer to certain persons seen in videos as "jailers" for simplicity. Such persons could be jailers or in the alternative medical personnel employed by County and/or CorrHealth.

29.    During roughly the first thirty minutes recorded that morning, Matthew is seen entering the bathroom and exiting only three minutes later. He immediately goes to the block jailer and appears to ask for help. He is obviously already in a large amount of pain as he is doubled over and even falls to the floor while speaking with the jailer. While the jailer makes some phone calls, Matthew goes back to a bathroom stall. He can be seen clutching the wall at one point. He struggles to exit the stall, falling backward a few times until another inmate comes to check on him. While the videos have no audio, it is apparent that Matthew may be crying out in pain, since several other inmates get out of their bunks to observe the situation unfolding. Matthew exits the stall with his pants around his ankles and moves to a shower stall to clean himself up. An inmate again checks on Matthew while in this stall and carries out an article of his clothing. Matthew then moves to a smaller shower stall, one without a curtain, and continues washing himself. He uses the wall for

support as he stands until an inmate brings him a shower chair to sit on. A jailer speaks with Matthew while he sits in the shower, wobbling and rocking back and forth, unable to focus on the jailer with the amount of pain he is in. Matthew is clearly under an extreme amount of pain – rocking, holding his abdomen, face twisted in pain. He gets out of the shower chair, only to fall to his knees in pain. The chair in front of him moves and he lays flat for a moment before standing to put on a new jumpsuit. This is not done without struggle—Matthew falls and doubles over many times while attempting to dress himself. Once dressed, Matthew is escorted to the medical segregation cell with assistance from jailers.

30.     This paragraph covers roughly the next thirty-minute time period. Matthew is escorted to the medical segregation cell and before even entering the cell, he must use the wall to steady himself. He is fully doubled over in pain and is unable to stand straight. He immediately stumbles to the bed in pain. Matthew is seen in his bed, clutching his stomach in pain. He sits up and lays back down multiple times and is visibly grimacing. He stands and leans over the toilet as if he is throwing up, or is attempting to. The censor bar, which automatically "blacks out" portions of the video for modesty reasons, makes it impossible to tell if he did in fact vomit. During this, the top of his jumpsuit comes undone. He then begins rocking himself on the edge of his bunk, clutching his stomach as if to alleviate some of the pain. He paces around his room again, leans over his bed, and pulls his jumpsuit down to his waist. After several minutes, he attempts to lie down, but he quickly moves back to the toilet once again. He uses the walker next to the toilet for support as he is unbalanced and unable to sit or stand straight. His face is red, and he is visibly sweating. He appears to vomit again and lays back down only for a moment before going back to the toilet. During this, his jumpsuit comes completely off. Matthew makes no effort to put it back on. He periodically paces around his cell, leaning over the bed, desk, and shower area, as if at a

loss of what to do. By the end of the 30-minute period, Matthew is lying in his bunk. While multiple staff members have passed his cell, none appear to have made contact with Matthew.

31.     This paragraph covers roughly the next thirty-minute time period. Matthew lies in bed for a few moments, clutching at his stomach and rolling around in pain. He appears to accidentally smear feces on himself but does not notice or care given his situation. He sits on the toilet for another few minutes before attempting to lie down again. At this point, the jailer stationed outside of Matthew's cell looks in, and Matthew appears to be trying to explain the amount of pain he is in. The jailer returns to his or her seat and Matthew returns to the toilet. He stands, bends, and squats while stabilizing himself on his bed in an attempt to alleviate the pain. He lies down once again, but his pain clearly does not subside, as he begins the cycle of rocking himself and pacing all over again. Medical staff arrive and talk to Matthew through the cell intercom, but Matthew is unable to stop moving due to the amount of pain he is in. A jailer watches as he doubles over onto his table, shaking and fighting to stay upright. Matthew manages to put his jumpsuit back on most of the way, but not without falling and needing to sit down. Medical staff enters his cell to check his blood pressure and check on his abdomen by listening to it and feeling it. Even while being examined, Matthew is beside himself in pain. A jailer leaves an object on his table, but Matthew does not take it. Instead, he begins another cycle of lying down, sitting up, standing, and lying back down. This continues for several minutes, all the while Matthew is shaking and appearing to try to brace himself against the immense amount of pain he is in. Staff return and talk to Matthew through the meal slot and gives him something, which he takes with water.

32.     This paragraph covers roughly the next thirty-minute time period. This unfortunately provides Matthew with no relief. He lays down after pacing his cell and pulls his blanket over his head in an attempt to get some sleep. Even while trying to rest, Matthew is

writhing in pain. It is unlikely that Matthew gets any sleep given the frequency he moves around in an attempt to find a more comfortable position. A jailer makes contact with Matthew, but Matthew is still forced to wait out his pain. His pain appears to become somehow worse based on how much more often he is seen pacing around his room and clutching his stomach in pain.

33.    This paragraph covers roughly the next thirty-minute time period. He vomits into the toilet several times, but this again provides no relief. He lays down and stands up several more times, constantly rubbing and clutching his stomach in agony. Medical staff arrive and provide Matthew with an enema, which he immediately uses in the shower before sitting on the toilet. He appears to struggle to expel the liquid solution as he rocks on the toilet in obvious pain. He again uses a walker next to the toilet to support himself, too weak to sit without assistance.

34.    This paragraph covers roughly the next thirty-minute time period. Matthew moves back to bed, in far too much pain to put his jumpsuit back on. Unable to rest, he returns back to the toilet almost instantly. A staff member speaks with him briefly through the cell intercom while he sits in pain on the toilet. He is seen clutching the walker again, bracing himself for the waves of pain he is experiencing. He paces around and returns to the toilet with a blanket to cover his head, as if even the light and seeing his surroundings are too much stimulation for the amount of pain he is suffering. He returns to bed for only a moment, twitching and visibly breathing heavily before returning to his spot on the toilet, covered by his blanket. After several minutes, jail staff attempt to get his attention from outside of the cell before entering with medical staff.

35.    This paragraph covers roughly the next thirty-minute time period. Matthew's blood pressure is taken once again, and it appears that he is given some liquid to drink. After this, he is able to lay down for a few minutes, but sits up once again in pain before getting any real rest. He sits back down on the toilet, then tries once again in vain to get some rest. He repeats this process

many times, and at no point shows any sign of relief from his pain. He taps the window of his cell and presses the intercom button while lying down.

36.     This paragraph covers roughly the next thirty-minute time period. After attempting to relieve himself and get some rest again, Matthew taps on his cell window. He speaks with a jailer, unable to even sit up while he apparently asks for help. He can be seen clutching his stomach and rocking back and forth while lying down in an attempt to ease the pain. While sitting on the toilet again, he appears to faint and hits the ground. He sits on the toilet again after a few moments and begins to hit his stomach in frustration. Matthew attempts to use the shower, but has to sit down multiple times due to his pain being too intense to stand, eventually resorting to bringing a chair into the shower to sit while he attempts to rinse off. He lays back down after his shower, not able to dry anything but his face. He pulls his blanket over his head to block out his surroundings in an attempt to rest.

37.     This paragraph covers roughly the next thirty-minute time period. Matthew tries for several minutes to rest, but is assumed unsuccessful given the amount he moves around. He continues his cycle of attempting to rest, trying to use the restroom, all the while doubled over in pain.

38.     This paragraph covers roughly the next thirty-minute time period. Matthew presses against his stomach, seemingly in an attempt to relieve some of the pain he has been experiencing for hours. He tries again to get help from the jailer stationed right outside of his cell, but it does not appear that his contact with the jailer led to any help. Matthew sits up and leans against the wall before falling over, unable to keep himself upright. He appears to be spitting up a clear liquid as he lay limply on his bed. He twitches and tenses his body a few times and is able to move his

legs onto the bed, but is otherwise motionless for several minutes. During this, two jailers can be seen talking directly outside of Matthew's cell, backs turned to his suffering.

39.     This paragraph covers roughly the next thirty-minute time period. Matthew finds the strength to move to the toilet where he again clutches the walker for support. He is becoming visibly weaker, moving much less than before. He tilts his head towards the ceiling and hits the wall as a display of the agony he is in. He hits his cell window and presses the intercom button, desperate for help. Despite numerous jailers passing his cell, nobody arrives to help for several minutes. Matthew is seen breathing heavily, clutching his stomach, and trying again to get the attention of the jailers posted outside of his cell. He appears to then begin gasping for air, struggling under the immense pain he is in. This leads to him falling to the ground, and his depleting strength is apparent even as he pulls himself back into bed. Medical staff appear outside his cell. They do not enter.

40.     This paragraph covers roughly the next thirty-minute time period. Medical staff seem to hesitate to enter the cell as Matthew vomits and slowly lays back onto his bed. His entire body is experiencing tremors until he becomes still and rigid. He becomes unresponsive before any staff enters his cell. Once he is unresponsive, there are suddenly close to a dozen staff members available to help him. Multiple staff members attempt CPR on him both in the cell and on the way to the ambulance, but Matthew never regains consciousness.

### 3.     Texas Rangers Investigation

41.     The Texas Rangers investigated the decedent's death. The purpose of a Texas Rangers investigation regarding a custodial death, such as the decedent's, is to determine whether there was any criminal responsibility for what occurred. Texas Rangers do not determine whether there is civil liability for violation of a person's constitutional rights, such as that alleged in this

case.  Therefore, the Texas Rangers' determination as to whether to turn the case over to a grand jury and recommended prosecution does not determine whether Defendants are liable for the decedent's death.

42.     Ranger Matthew Kelly investigated Matthew's death and initially spoke with Wichita County Sheriff's Office Chief Deputy Will Rutledge. Chief Deputy Rutledge admitted that Matthew was transported to United Regional Hospital after suffering a medical emergency in the jail. Chief Deputy Rutledge admitted that Matthew had complained of stomach pain during the morning of April 1, 2022, and he alleged that Matthew's symptoms became progressively worse before he was transported to the hospital. Chief Deputy Rutledge made it sound as if Matthew was still ill at the time he was transported to the hospital. He was dead. Regardless, Matthew did not become "progressively worse" but suffered severe pain all morning on April 1, 2022. Emergency surgery on the morning of April 1, 2022 would have saved Matthew's life.

43.     Ranger Kelly also noted that Matthew was pronounced deceased by Wichita County Justice of the Peace James Hughes at 1:02 PM on April 1, 2022. When Ranger Kelly photographed the cell in which Matthew had been held, he saw a significant amount of toilet paper in the toilet with what appeared to be blood.

<u>4.     Texas Commission on Jail Standards Investigation</u>

44.     The TCJS conducted an investigation of the decedent's death.  The TCJS regularly conducts investigations of custodial deaths in Texas county jails, and it is the state agency charged with enforcing bare minimum jail standards. However, despite Public Information Act requests, at the time this complaint was finalized, Plaintiffs were unable to obtain from TCJS documents and/or evidence related to that investigation. It is Plaintiffs' understanding that Wichita County told TCJS that it objected to TCJS releasing records pursuant to the Public Information Act. Thus, Plaintiffs

will need to conduct discovery to obtain evidence which Wichita County apparently attempted to keep from Plaintiffs' counsel.

### 5.     Custodial Death Report (Filed with Attorney General)

45.     The Wichita County Sheriff's Department filed a custodial death report with the Attorney General of Texas.  Lisa Patterson, with the Wichita County Sheriff's Office, was the reporter for the custodial death report. The report was dated April 7, 2022 at 11:40 a.m. It indicated that Matthew was originally in custody at County jail at 12:52 p.m. on March 28, 2022, and that he passed away at 1:02 p.m. on April 1, 2022. In response to the question, "Had the decedent been receiving treatment for the medical condition that caused the death after admission to your jail's jurisdiction," the response was "Unknown." The report admits that the event causing Matthew's death occurred at 2815 Central Freeway East, Wichita Falls, Texas 76302, and that such was the County jail.

46.     The report admits that Matthew was not a security risk, as he did not display or use weapons, attempt to injure others, barricade himself or initiate a standoff, resist being handcuffed or arrested, physically assault or attempt to assault officers, verbally threaten anyone else, including officers, attempt to gain possession of an officer's weapon, or escape or attempt to escape from custody. The summary indicates that Matthew was transported to United Regional Healthcare System Hospital in Wichita Falls by AMR.

### 6.     Inmate Death Report (Filed with TCJS)

47.     Plaintiffs expect that County filed an Inmate Death Report with the TCJS. However, after numerous attempts to obtain records pre-suit from the TCJS, Plaintiffs were unsuccessful. It is Plaintiffs' understanding that one or more County officials told the TCJS that County objected to production of such records sought pursuant to the Public Information Act.

Therefore, after discovery, Plaintiffs may seek to re-plead to add additional allegations which will likely become apparent after review of records obtained through the discovery process.

6.     Medical Records

a.     EMS Records

48.     EMS records indicate that EMS responded to a non-responsive inmate, and that care was transferred to AMR at approximately 12:21 PM on April 1, 2022. CPR by AMR was started at that time. Records further indicate that Matthew was not breathing and had an AED attached to him. Records seem to indicate that Matthew was transported to the hospital at approximately 12:31 PM from the Wichita County jail.

b.     Autopsy Report

49.     The Office of the Medical Examiner in Dallas County, at the Southwestern Institute of Forensic Sciences at Dallas, conducted an autopsy of Matthew. The autopsy report findings indicated in part that Matthew had small bowel ischemia and infarction due to a small bowel obstruction. The findings also indicated that approximately one-half of Matthew's small intestines appeared ischemic and infarcted. Findings also indicated a possible small bowel volvulus with constriction of the small bowel mesentery. The history included the understanding that Matthew had complained of "severe abdominal pain and started vomiting." History also indicated that Matthew was unresponsive when arriving at the hospital and unable to be resuscitated. Dr. Stephen Lenfest, M.D., a medical examiner in Dallas County, provided the following conclusion: "Based on the case history and autopsy findings, it is my opinion that Matthew Ray Maxwell, a 32-year-old male, died as a result of complications of small bowel ischemia and infarction due to small bowel obstruction."

50.     Death investigation records obtained from the Dallas County Medical Examiner's office contain notes of one or more interviews by an apparent investigator, Ryan Ward. Notes

indicate that a physician, according to Ranger Kelly, pronounced Matthew as being deceased at 1:32 PM on April 1, 2022. Further, Justice of the Peace Hughes pronounced Matthew deceased at 2:29 PM. As indicated elsewhere in this pleading, Matthew was deceased before 12:30 PM on April 1, 2022.

51.     The apparent investigator indicated that Ranger Kelly told him in part that, on the morning of April 1, 2022 at 6:00 AM, Matthew "exhibited odd behavior in a private shower. He was on video complaining of abdominal pain and sweating profusely. He refused to keep on his clothes and started vomiting blood that progressively got worse. [Matthew] was taken to the infirmary and given anti-nausea medications. His blood pressure was high. [Matthew went] unresponsive and CPR was started by the nurse. He was transported to [the] hospital at 1218 hours and arrived to the [Emergency Department] at 1230 hours. There were no surgical interventions."

52.     Apparent Investigator Ryan Ward further reported that Matthew had not been taken to the jail infirmary after sweating profusely and complaining of abdominal pain, but instead simply taken to a medical cell "for observation" where he was seen by a nurse. Steven Lenfest was purportedly told by Ranger Kelly that Matthew "had vague complaints of not feeling well around 0600 on 04/01/2022, and pretty quickly complained of severe abdominal pain and started vomiting. He was immediately moved to a medical cell for observation. [Matthew] took off all his clothes and was complaining of being hot." The allegation of "vague complaints" was false. One or more other people reporting what Matthew complained about initially on the early morning of April 1, 2022, and even Ranger Kelly himself, indicated that Matthew complained of severe pain. In fact, as described elsewhere in this pleading, one other witness indicated that Matthew was screaming in the shower due to the severe pain.

53.     As further support for the fact that Matthew was so ill he could not even remain clothed, records related to his autopsy at the Southwestern Institute of Forensic Sciences indicate that Matthew was received with no clothing at all. This is highly unusual, as virtually all autopsies have supporting records which indicate that a person incarcerated in a jail was received with some type of clothing, most typically jail-issued clothing.

C.      Liability of Wichita County and CorrHealth

1.      Introduction

54.     Plaintiffs set forth in this section of the pleading additional facts and allegations supporting liability claims against County and CorrHealth pursuant to *Monell v. Department of Soc. Svcs.,* 436 U.S. 658 (1978) and/or other applicable law.  It is Plaintiffs' intent that all facts asserted in this pleading relating to policies, practices, and/or customs of County and/or CorrHealth support such liability claims, and not just facts and allegations set forth in this section.  Such policies, practices, and/or customs alleged in this pleading, individually and/or working together, and whether supporting episodic acts and omission and/or conditions of confinement claims, were moving forces behind and caused the constitutional violations and damages (including death) referenced herein.   These policies, practices, and/or customs are pled individually and alternatively. County and/or CorrHealth knew, when County incarcerated the decedent, that their personnel, policies, practices, and/or customs were such that they could or would not meet constitutional obligations to protect the decedent, including but not necessarily limited to through provision of medical care. Further, consistent action and inaction by a number of County and/or CorrHealth employees and/or agents, specifically with regard to the decedent, confirms policies, practices, and/or customs in this complaint. County made decisions about policy and practice which it implemented through its commissioner's court, its sheriff, its jail administrator, and/or through such widespread practice and/or custom that such practice and/or custom became the

policy of the County as it related to its jail. CorrHealth likewise made decisions about policy and practice which it implemented through appropriate employees, decisionmakers, and/or policymakers, and in the alternative and/or in addition through partnership and/or joint action with County. Regardless, the Fifth Circuit Court of Appeals has made it clear that Plaintiffs need not allege at the pleading stage the identity of chief policymakers.

55.     There were several policies, practices, and/or customs of County and/or CorrHealth which were moving forces behind, caused, were producing causes of, and/or proximately caused the decedent's suffering and death, and other damages referenced in this pleading. County and/or CorrHealth made deliberate decisions, acting in a deliberately indifferent (potentially applied only to any episodic act claims but not to alleged conditions of confinement claims) and/or objectively unreasonable manner, when implementing and/or allowing such policies, practices, and/or customs to exist.  Further, when County and/or CorrHealth implemented and/or consciously allowed such policies, practices, and/or customs to exist, they knew with certainty that the result would be serious injury or illness, suffering, and/or death.

## 2.     CorrHealth's Agreement and Partnership with Wichita County

56.     The business of providing, or in some situations unfortunately not providing, health care and mental health care to prisoners in county jails throughout the United States is big business. There are untold millions of dollars to be made by private companies, such as CorrHealth, promising and/or contracting to provide such services.  CorrHealth is no exception to the rule that such companies are in business to make significant profits.

57.     CorrHealth maintains a website in which it touts its services as a for-profit medical provider for jails in Texas, New Mexico, Colorado, and Wyoming. It indicates, as of September 25, 2023, it had 300 tenured correctional healthcare professionals who cared for nearly 10,000 people per day. It also advertised that it is proactive and assertive in mitigating its county-partners'

looming risks and liabilities. CorrHealth's website provides a number of testimonials by employees of various counties regarding its provision of services. The chief deputy of Jefferson County, Texas wrote in part that he appreciated the lengths CorrHealth goes to in an effort to reduce Jefferson County's costs. Lisa Patterson, Captain of the Wichita County, Texas jail, wrote that CorrHealth transitioned its team and programs in both Wichita County detention facilities on March 1, 2022. Thus, CorrHealth became Wichita County jail's healthcare provider one month before Matthew's death. Ms. Patterson indicated that the previous medical provider was WellPath.

58.      CorrHealth also advertises on its website statements made by Jon Nichols, retired lieutenant of the adult detention center in Midland County, Texas. Retired Lieutenant Nichols wrote in part that unnecessary medical-related transports [to hospitals] are labor and time-intensive, costly, and increase risks and liabilities. He further wrote that decreasing such transports was a prime focal point for Midland County when selecting its healthcare provider. He also wrote that CorrHealth's leadership presented creative solutions to reduce such transports. He moreover talked about, within 12 hours of the transition to CorrHealth, CorrHealth policies resulting in three people not being transported to a hospital which would have been transported with Midland County's previous detainee medical services provider. CorrHealth writes on one page, "While we understand off-site transports will still be delivered to those requiring additional attention, we aim to limit these transports as much as possible." CorrHealth promises to save counties money.

59.      CorrHealth's website also references a number of relationships it has, and/or support it provides, to various correctional-related entities. Upon information belief, it does so because it knows it must market its for-profit services to law enforcement and/or jail personnel. It must be viewed as a partner with jails. Its primary focus is thus keeping its clients, such as County, satisfied with compensation they pay for provided services. Corrections-related entities

CorrHealth lists include the Texas Jail Association, Sheriffs' Association of Texas, Correctional Management Institute of Texas, Texas Association of Counties, East Texas Peace Officers Association, Colorado Jail Association, County Sheriffs of Colorado, Rocky Mountain Jail Leadership Academy, American Jail Association, National Sheriffs' Association, and Western State Sheriffs' Association. Interestingly, the Texas Association of Counties Intergovernmental Risk Pool provides coverage for claims, for a substantial number of Texas counties, for failure to provide medical care to jail detainees.

60.     CorrHealth also advertises: "CorrHealth's programs and services are designed to maximize on-site programs and services, reduce inmate movement and decrease costly, risk-laden, offsite medical-related transports." It also advertises: "CorrHealth partners with our counties to assist them in reducing overall costs and mitigate risk and liability. By reducing off-site transports and maximizing on-site services as well as by providing ongoing support and additional training for our qualified health care teams, [CorrHealth] ensure[s]that the goals of the county are a priority as part of our partnership." Explicitly and implicitly, CorrHealth signals its intent to reduce hospital transports. This resulted in Matthew's horrific suffering and death.

61.     Plaintiff's counsel was unable to obtain the inmate healthcare services agreement between County and CorrHealth. However, upon information and belief, the agreement between County and CorrHealth was substantially and/or materially the same as that between Jefferson County, Texas and CorrHealth commencing in April 2018. Upon information and belief, CorrHealth's written contracts with various counties across Texas are substantially similar and/or contain substantially similar material terms. Plaintiffs reserve the right to amend this complaint after being able to conduct discovery and after Plaintiffs' review of all such relevant agreements to be produced, as required by the Federal Rules of Civil Procedure, with Defendants' initial

disclosures. Thus, Plaintiffs' allegations referencing the agreement in this section of the complaint are all made upon information and belief.

62.     The agreement recognized that County is charged by law with the responsibility of obtaining and providing reasonably necessary healthcare for detainees at the County jail. The agreement also further recognizes that CorrHealth is in the business of providing correctional health services and desires to provide such services for County pursuant to terms and conditions in the agreement. Further, the agreement indicated that County contracted with CorrHealth to provide for delivery of medical, dental, and mental health care to detainees in County's jail(s). The agreement indicated that CorrHealth's responsibility for medical care began when a person was booked into County's jail.

63.     CorrHealth's services included but were not limited to intake health screenings, regularly-scheduled sick calls, nursing coverage, regular physician visits on site, infirmary care, hospitalization, medical specialty services, emergency medical care, medical records management, pharmacy and pharmaceutical services, laboratory services, radiology services, auditory services, ophthalmology services, health education and training services, utilization review, a quality assurance program, administrative support services, dental services, and on-site emergency medical treatment for visitors or county personnel. However, the agreement contained an exception for providing elective medical care to detainees. "Elective medical care," for purposes of the agreement and partnership between County and CorrHealth, means medical care which, if not provided, would not, in the opinion of CorrHealth's medical director, cause a detainee's health to deteriorate or cause definite harm to the detainee's wellbeing.

64.     The agreement further provided a stipulation regarding transporting services. Non-emergency and emergency transportation services, including reasonable security, were to be

provided and paid for by County. CorrHealth was responsible for requesting transportation in accordance with policies and procedures regarding transportation of detainees for medical reasons mutually developed by CorrHealth and County. Thus, County and CorrHealth entered a partnership, regarding policies, practices, and or customs, to be applied to detainees, such as the decedent in this case, regarding when or if at all to transport such persons to a local emergency department at an appropriate hospital.

65.     The agreement further provided that if County became dissatisfied with any healthcare personnel provided by CorrHealth, CorrHealth shall, following receipt of written notice from County of the grounds for such dissatisfaction, exercise its best efforts to resolve the problem. If County is not satisfied that such a problem has been resolved, County could revoked that employee's right to enter County's jails. Thus, County retained some control over the right of CorrHealth employees to work in its jail. The agreement further provided that the decision to revoke a CorrHealth employee's right to enter a County jail would be at the sole discretion of County. This furthered the partnership and agreement between County and CorrHealth, regarding formulation and application of policies and procedures, related to medical care to be provided (or not provided) to County jail detainees.

66.     The agreement further provided that CorrHealth would engage certain healthcare professionals as independent contractors rather than employees. Plaintiff does not necessarily agree with such characterization. Parties who contract cannot simply designate certain persons as independent contractors if the law applicable to determination of whether a person is an independent contractor, and any factors applied according to the law, indicate otherwise. It is not uncommon for companies, which are actually employers, to designate employees as independent contractors to avoid paying taxes. Upon information and belief, CorrHealth personnel working in

County's jail should have likely been characterized as employees and not independent contractors due to a number of factors, including providing and or instructing regarding the means and details of the work, specified work hours, and further providing items, systems, and or software with which such personnel could engage in medical services in the jail. Regardless, County reserved the right under the agreement to approve such medical professionals. County further consented to such alleged subcontracting or delegation. It appears that the provision was written to avoid potential government oversight, as the agreement indicated that as a result of the alleged independent contractor status of licensed healthcare professionals, CorrHealth allegedly would "not be considered or deemed to be engaged in the practice of medicine or other professions practiced by these professionals." Regardless, as to certain medical professionals, the agreement provided that CorrHealth would provide County evidence that CorrHealth had secured professional liability coverage of at least $2 million per incident, and $4 million in the aggregate.

67.     The agreement also provided that CorrHealth shall cause, require, and maintain complete and accurate medical and mental health records for every detainee in county jail who had received healthcare services from CorrHealth. Those records would be kept separate from detention records in accordance with applicable laws and/or Texas Commission on Jail Standards requirements. The agreement recognized that such medical records belonged to County, but that CorrHealth would be custodian of the records during the term of the agreement. Complete legible copies of such medical records would be available at all times to County and may be available to accompany each detainee transferred from County jail to another location.

68.     The agreement also provided that, upon County's request, CorrHealth shall provide to County, on a date and in a form mutually acceptable to County and CorrHealth, monthly and annual reports relating to services provided under the agreement. Further, if County requested,

CorrHealth would submit monthly and other periodic reports to County's sheriff and or detention administration at the jail regarding the overall health of detainees committed to the custody of County. Such reports would be submitted on a regular, periodic, or as-requested basis as determined by mutual written agreement between County and CorrHealth. Further, reports were to be provided daily to County's sheriff, jail administration, and or their designee(s) regarding detainees in offsite, hospital care. Such reports shall include such detainees' condition and estimated duration of hospital stay and approximate date of return, if at all, to County's jail. CorrHealth would further confirm the need for continued offsite care through such daily report.

69.     Upon information and belief, the purpose of such reporting was in part to enable County to make a determination whether it would discharge a detainee from custody. Counties across Texas frequently, and likely daily, discharge detainees from custody when counties realize that their constitutional obligation to provide medical care may come at significant economic cost. In fact, it is most often the situation when a person, for example, suffers a significant brain injury and or appears to be close to death, that Texas counties will discharge such persons from custody due to the likely significant hospital bill that will arise from continued inpatient care. The daily reporting is both direct and circumstantial evidence of the significant materiality and importance to both County and CorrHealth of saving money by not transporting people, such as the decedent, to a local hospital. Upon information and belief, there was a culture and practice to discourage transporting detainees to a hospital due to the significant likelihood of the medical bills that would result.

70.     The agreement further provided that CorrHealth shall make available to County, at County's request, all records, documents, and other papers relating to direct delivery of healthcare services to detainees. This could occur during normal business hours and as often as County

deemed appropriate. The agreement also provided that County would provide to CorrHealth, at CorrHealth's request, County's records related to provision of healthcare services to detainees.

71.    Plaintiffs are uncertain, and thus cannot allege upon information and belief, as to the exact amount of compensation being received by CorrHealth from County. However, by way of example, in the Jefferson County agreement referenced in this complaint, CorrHealth was to be paid over $4 million annually, including $80,000 each week for the first quarter of services. Each monthly payment was to be paid by Jefferson County to CorrHealth before or on the last day of every month. Upon information and belief, County paid CorrHealth millions of dollars regarding providing medical care to County jail employees.

72.    The agreement further provided that CorrHealth would be financially responsible for costs associated with off-site treatments, hospitalization of detainees, medical specialty services, radiology services, and certain transportation services. The agreement further provided a maximum liability to CorrHealth for costs associated with the provision of off-site medical or other healthcare services, such cap being in the amount of $500,000 in the aggregate for each contractual year. Costs for any medical or other health services set forth in the contract which were to be provided to detainees during a contract year which exceeded this cap would be the responsibility of County. Thus, County and CorrHealth shared concern over provision of services which would lead to significant expense, such as those provided by an outside hospital.

73.    The agreement further contained an indemnity provision, whereby CorrHealth would indemnify, defend, and hold harmless County and County's elected officials, officers, agents, and employees, from claims, costs, attorney's fees, lawsuits, judgments, and/or liabilities suffered or incurred by CorrHealth resulting in any way from negligence, inadvertence, error, or

omission of CorrHealth and/or its agents and/or employees for failure to carry out responsibilities under the contract, including responsibilities imposed by state and federal law.

74.     The agreement further provided that CorrHealth would be an independent contractor and as such had sole responsibility for all diagnosis, treatment, and disbursement of all medication for medical, mental, and dental health. Further, the agreement provided that CorrHealth would have primary but not exclusive responsibility for identification, care, and treatment of detainees requiring medical care and who were security risks or presented a danger to themselves and/or others. Regardless of these contractual provisions, County had a non-delegable duty to provide medical care to and protect detainees such as the decedent. Neither CorrHealth nor County were able to contract away their constitutional duties and obligations.

<u>3.     Non-Delegable Duties and Respondeat Superior</u>

75.     County owed non-delegable constitutional duties to the decedent.  Therefore, County is liable for the policies, practices, and/or customs of CorrHealth, as well as the actions and/or inactions of CorrHealth employees, which caused, were proximate causes of, and/or were producing causes of damages (including death) referenced in this pleading.

76.     Moreover, CorrHealth, in addition to liability for its policies, practices, and/or customs resulting in damages (including death) referenced in this pleading, is also vicariously liable, pursuant to respondeat superior, for the actions and/or inactions of its employees and agents. Plaintiffs make this allegation pursuant to existing law and/or as a good faith argument for the extension or confirmation of existing law.  CorrHealth, as a large, private, for-profit entity, does not receive the same protection and/or is not, in the alternative, analyzed the same way as a liable entity as would be a county or other governmental body.  Moreover, as to CorrHealth employees and agents, due to CorrHealth's status as a large, for-profit corporation, and controlling Fifth Circuit authority, they are not entitled to claim qualified immunity.  No such employees are

Defendants in this case, and Plaintiffs currently have no intent to add any natural persons as Defendants to this case. Further, upon information and belief:

- CorrHealth was systematically organized to perform the major administrative task of providing medical and mental health care in jails inside and outside Texas.

- CorrHealth was at the time of incidents relevant to this case in the business of administering correctional healthcare services.

- CorrHealth has made millions of dollars each year from its contracts with Texas and other jails.

- CorrHealth was at the time of decedent's death a systematically–organized entity with limited direct supervision by County, undertaking its task for profit and while in competition with other for-profit firms providing similar services.

- Market forces existed at all relevant times that were likely to provide CorrHealth with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or non-arduous employee job performance.

- Ordinary marketplace pressures were present at all relevant times regarding CorrHealth's provision of services to County.

- CorrHealth may have had, upon information and belief, a multi-year contract with County with renewal periods, such that its performance was disciplined by pressure from potentially competing firms who could try to take its place in providing services to County.

- CorrHealth was required by its contract to purchase insurance to compensate victims of civil rights torts, such insurance coverage being substantial. CorrHealth provided professional/medical malpractice liability coverage in an amount of not less than $2,000,000 per occurrence and $4,000,000 in the aggregate.

- CorrHealth, upon information and belief, maintained a risk management and legal defense team ready to aggressively address each claim or lawsuit against it.

- CorrHealth employed medical professionals who faced potential liability both for choosing a course of treatment that is too aggressive and for choosing a course not aggressive enough, rather than jailers who rarely face liability for the adequacy of provided medical care.

- CorrHealth's primary function at the jail was providing healthcare and mental healthcare services.

- CorrHealth employees are overseen by CorrHealth.

- CorrHealth, as opposed to County, upon information and belief, took the lead in developing relevant policy regarding healthcare and mental health care provision in the County jail.

- CorrHealth developed and maintained, upon information and belief, the County jail's healthcare policies and procedures manual.

- County could not, upon information and belief, fire or discipline CorrHealth's employees.

- CorrHealth employees had discretion to take certain actions which County employees lacked the authority to do.

- CorrHealth employees did not have a broad range of duties other than providing healthcare and/or mental health care.

- CorrHealth had substantial latitude to ensure that its employees were adequately motivated (such as through employer indemnification, increased benefits, and higher pay, each being used as a tool).

- CorrHealth's employees were "at will" employees and could be discharged at any time without cause.

- CorrHealth determined its employees' wages, conditions of employment, and availability of benefits.

- CorrHealth marketed its ability, upon information and belief, to attract qualified people to public service as an aspect of its sales pitch to County and other governmental clients.

- CorrHealth, and likely its employees, knew that they could be subject to liability without the benefit of qualified immunity. Even so, CorrHealth was able to attract qualified employees.

- CorrHealth contracted to indemnify County for liability caused by CorrHealth or its agents, employees, or contractors.

4.    Wichita County and CorrHealth Policies, Practices, and Customs

77.    Plaintiffs list beneath this heading County and/or CorrHealth policies, practices, and/or customs which Plaintiffs allege, upon information and belief, caused, proximately caused, were producing causes of, and/or were moving forces behind all damages referenced in this pleading, including the decedent's death.  Thus, County and/or CorrHealth are liable for all such damages.  These policies, practices, and/or customs worked individually, and/or in the alternative together, to cause the decedent's death and all other damages asserted in this pleading. Plaintiffs plead conditions of confinement claims arising from policies, practices, and/or customs. Deliberate indifference is not an element of, or a requirement to prove, conditions of confinement claims. In the alternative, Plaintiffs plead episodic act and/or omission claims arising from policies, practices, and/or customs. Plaintiffs plead, to the extent necessary, that deliberate indifference underlying episodic act and/or omission claims, upon information and belief, occurred with regard to relevant actors. Regardless, Plaintiffs ask that the court apply the correct law to the facts pled, as required by United States Supreme Court precedent.

78.    One or more courts have recognized that it is exceedingly rare that a Plaintiff will have access to or personal knowledge of specific details regarding the existence or absence of a defendant's internal policies or training procedures before discovery. Thus, at the pleading stage, a plaintiff is merely required to put a governmental entity or private corporation on fair notice of the grounds for which it is being sued. Federal courts must rely on summary judgment to weed out unmeritorious claims. Plaintiffs thus plead the following policies, practices, and customs, which give rise to conditions of confinement claims, or in the alternative episodic act and/or omission claims:

- Wichita County and/or CorrHealth failed to monitor or in the alternative had inadequate monitoring of detainees.

- Wichita County and/or CorrHealth failed to reprimand and/or take remedial action against employees and/or agents as a result of action and/or inaction related to the decedent's suffering and death, thus confirming that the policies, practices, and/or customs which led to such suffering and death were in fact *de facto* policies of Wichita County and/or CorrHealth.

- Wichita County and/or CorrHealth, while knowing that detainees needed immediate emergency medical care, would continue incarcerating such detainees in lieu of obtaining such needed care.

- Wichita County and/or CorrHealth, in the alternative, while monitoring detainees, failed to take action based upon material information obtained during such monitoring regarding serious health issues. This was due in part, as may be true with other potential policies, practices, and/or customs, to attempt to save costs.

- Wichita County and/or CorrHealth would take actions designed to save Wichita County and/or CorrHealth money, by failing and/or refusing to transport to a local emergency room detainees who vitally needed emergency medical care.

- Wichita County and/or CorrHealth failed to provide and/or delayed providing medical treatment to detainees.

- Wichita County and/or CorrHealth allowed and/or sanctioned false observation and/or other relevant logs regarding detainees. Logs for detainee checks in County's jail relating to Matthew during the final hours and days of his life indicate, as both direct and circumstantial evidence, that County gave short shrift to its duties to appropriately protect detainees through, in part, making appropriate observations. Such records contain false entries. By way of example, a housing unit security check log for April 1, 2022 contains a number of entries indicating, regarding checks of Matthew beginning early in the morning, "Well-being check inmate and cell okay (MED 105)." Matthew was clearly not well, and everyone knew it. Regardless, the same formulaic entry was provided time after time in the log. Amazingly, such entries continued when Matthew was deceased or close to deceased, with such "well-being" checks being indicated at 12:20 p.m., 12:40 p.m., 1:10 p.m., 1:17 p.m., 1:40 p.m., and 1:59 p.m. These entries were clearly false.  Further, the inmate meal log for Matthew contained a false entry. An entry indicated that Matthew accepted his lunch meal on April 1, 2022, at nearly 11:45 p.m. It never happened.

- Wichita County and/or CorrHealth treated detainees without apparent health insurance differently than those with apparent health insurance. Upon

information and belief, CorrHealth personnel participated in and medically cleared Matthew for incarceration in County's jail on March 28, 2022. As part of the process, Matthew signed a form document, for Texas Health and Human Services, entitled "Application for Health Care Assistance." The form indicated that Matthew had no money in his commissary or jail account. The form also indicated that Matthew had not worked in the three prior months. Upon information and belief, this was a form whereby Matthew could potentially obtain governmental assistance for any health care he needed while incarcerated in the jail. Thus, Defendants were aware that Matthew apparently had no health insurance which would cover any treatment he received, including any needed medical treatment at a local hospital.

- Wichita County and CorrHealth would only contact EMS and/or transport a person to a local hospital if the person appeared to be near death or had become nonresponsive.

- CorrHealth would not respond to a detainee's cell for an evaluation and subsequent emergency medical treatment, if determined to be necessary, if a jailer called for a medical emergency.

- Wichita County and/or CorrHealth may not have appropriately communicated from one shift to another regarding a detainee's serious medical needs through appropriate pass down notes/logs and/or meetings. In this case, the decedent's issues were obvious near the end of one shift and continued through hours of suffering and death during another shift.

- CorrHealth might have incentivized its employees and/or alleged independent contractors through payment of bonuses and/or provision of other benefits if those employees and/or alleged indpendent contractors acted in a way that saved expenditures for medical and/or mental health services, including by limiting transports of jail detainees to local hospitals.

- Wichita County and/or CorrHealth employees would not respond, or in the alternative not respond appropriately, to serious medical and/or mental health situations which were visible and apparent through the video feed of a detainee's cell. In the alternative, Wichita County and/or CorrHealth ignored the video feed of a cell containing a detainee suffering serious medical and/or mental health issues.

- Wichita County used jailers who did not have permanent jailer licenses, but instead only temporary jailer licenses. Georgeana Latham, for example, began working at the Wichita County Sheriff's Office under a temporary

jailer license on or about September 10, 2021. She did not obtain a permanent jailer license until August 30, 2022. A person may work under a temporary jailer license without any jail-related education, and without any jail-related experience. A person could, for example, be working one day at the person's first and only job, at a fast-food restaurant, and then the next day began working at a jail in which they are confronted with detainees with serious medical and mental health issues. Plaintiffs expect that they may find through discovery that other jailers who came in contact with Matthew likewise operated under only temporary jailer licenses.

5.    TCJS Records Demonstrating County Practices and/or Customs

79.    TCJS reports and documents regarding inspections of County's jail further demonstrate these and other policies, practices, and/or customs which, when applied individually and/or working together, caused, were proximate causes of, producing causes of, and/or were moving forces behind damages (including death) asserted in this pleading.

80.    The Texas Commission on Jail Standards ("TCJS") inspected the Wichita County jail from March 23-25, 2010. The TCJS notified Wichita County that, as a result of the inspection, deficiencies existed. TCJS urged Wichita County to give areas of non-compliance its serious and immediate consideration and to promptly initiate and complete appropriate corrective measures. TCJS notified Wichita County that its failure to initiate and complete corrective measures following receipt of a TCJS notice of non-compliance could result in issuance of a remedial order. The Wichita County sheriff and, upon information and belief the county judge and/or one or more county commissioners, received written notice of the inspection and result. Moreover, upon information and belief, such receipt and/or notice occurred regarding all TCJS inspections and results referenced in this complaint.

81.    TCJS inspectors determined, after reviewing quarterly training logs, that jail staff were not receiving training no less than once each calendar quarter. Regarding emergency situations in the jail, the TCJS standard required training of staff for emergency situations

immediately upon employment and no less than each calendar quarter for all jail personnel. Moreover, TCJS cited County regarding its obligation to appropriately observe detainees. Documentation revealed that observation of detainees in holding and detoxification cells exceeded the maximum 30-minute interval. Further, after reviewing inmate medical records, TCJS staff determined that medical staff in the jail were not following physicians' instructions. Detainees were not receiving medication as directed by physicians. Further, TCJS inspectors determined that the approved mental disability/suicide prevention screening instrument was not being fully completed for all newly-admitted detainees as required. TCJS inspectors also determined, after reviewing documentation for visual face-to-face observations of detainees, that observation times exceeded 30 minutes for all detainees that were known to be assaultive or potentially suicidal, mentally ill, or who had demonstrated bizarre behavior.

82.    TCJS inspectors inspected County's jail from June 24-26, 2013. Inspectors had to provide technical assistance, specifically that County ensure that medical staff complete all medical information in detainees' medical files. Inspectors also determined, from visual observation, that there was an overabundance of filing that needed to take place at the Sprague Annex. Further, while reviewing a random selection of inmate medical files, TCJS inspectors determined that various files did not have the required intake screening form and/or the Continuity of Care Query (CCQ) form. A CCQ is a query as to whether a person has previously received inpatient mental health care. Inspectors also noted that, when there were indicators on the intake screening form, a magistrate was not being notified as required.

83.    TCJS inspectors inspected County's jail again from June 30 through July 1, 2014. Inspectors once again provided technical assistance. Inspectors required County to ensure that, when medical staff were completing an intake screening form, and a detainee answered questions

that indicated that he or she had a mental illness, medical staff must check "yes" to the question as to whether the screener suspected mental illness/mental retardation. Medical staff were only answering "yes" and notifying a magistrate unless a detainees showed signs of "mental retardation." After discussion with a captain in the jail, it was decided that a lieutenant would pull all inmate medical files and review all intake screening forms to attempt to remedy the situation.

84.     TCJS inspected County's jail from May 19-21, 2015. As a result, once again, County was in non-compliance. Once again, TCJS notified County to give areas of non-compliance its serious and immediate consideration and to promptly initiate complete and appropriate corrective measures. TCJS reminded County that, if it failed to initiate and complete corrective measures, following notice of non-compliance, TCJS could initiate a remedial order.

85.     TCJS determined, after reviewing quarterly training documentation, that not all jailers were receiving SCBA training as required by minimum standards. Further, when walking through the jail, TCJS inspectors noted a lot of graffiti from where inmates had drawn on cell walls, and that there was abundance of trash on cell floors including rotten food. Inspectors, after reviewing documentation for the annual health inspection, found that violations had been noted but not addressed. This inspection had occurred over a month before, on April 3, 2015.  Inspectors also noted a long list of facility and/or preventive maintenance issues.

86.     TCJS inspected County jail from May 12-13, 2020. The inspector had to provide technical assistance after reviewing health service documentation. The inspector determined that on occasion the jail's mental disability/suicide prevention screening instrument was not being completed in its entirety. Missing fields included times, explanations as to positively-indicated answers, and notifications. The inspector noted that medical services in the jail were provided pursuant to a contract with County, and that administration was notified of the issue. The inspector

required jail administration to promptly develop a plan of action to update training of all medical staff who conducted mental disability/suicide prevention screening and to provide the inspector a roster verifying that such training took place. The inspector also noted the continuing problem of jail sanitation, noting that sanitation issues existed in multiple single occupancy cells at the annex location. There was trash buildup, food containers, and fruit flies in multiple single occupancy cells at the time of inspection. Jail administration was required to send a follow up email to the inspector detailing plans to remedy the problem.

87. The TCJS inspected the jail again from May 24-25, 2021. When inspecting the downtown facility, the inspector found that medical waste, including full sharps containers and biohazard bags filled with medical waste, were being stored in a cell. The area in which such storage occurred was considered inmate housing and not a proper medical waste storage area. Jail administration had to develop a plan of action to ensure that medical waste was properly stored and disposed of in a timely manner. The plan of action had to be scanned and emailed to the inspector within 30 days.

88. The inspector also found, when walking through the downtown facility, a five gallon bucket filled with concrete. An eye bolt was embedded in the concrete and had leg irons attached to it. Jail administration referred to it as a "mobile restraint device." They further indicated that it was to "restrain unruly inmates during GED class, interviews or other programs that may take place." The inspector notified jail administration that such a device could be considered inhumane and could moreover possibly exacerbate physical infirmities.

89. The TCJS inspected the jail on August 10, 2022 and found the jail to be non-compliant. Once again, County was urged to give areas of non-compliance its serious and immediate consideration and to promptly initiate and complete appropriate corrective measures.

Once again, County was warned that its failure to initiate and complete corrective measures after its receipt of a notice of non-compliance could result in issuance of a remedial order. A document associated with that failure was signed by the sheriff and the jail administrator, and further contained an indication that Judge Woody Gossom was briefed by phone. This obviously occurred after Matthew's death and thus confirmed pre-existing policies, practices, and/or customs.

90.    The inspector, when reviewing restraint logs, noted that observation checks were conducted outside the required 15-minute timeframe by as little as one minute to as much as nine minutes on multiple occasions. The inspector notified jail administration that such observation checks had to be conducted in accordance with minimum jail standards. The inspector required administration to conduct documented training with jail staff on the use of restraints and requirements outlined in minimum standards, and that such would occur within the next 30 days. It is vitally important, from a medical perspective, that such observations be made. Otherwise, serious injury and/or death could occur. This was yet another example of County's and/or CorrHealth's failure to properly observe and/or treat detainees.

91.    Further, when reviewing detainee medical files, the inspector found that jail staff, on multiple occasions, failed to complete the Screening Form for Suicide and Medical/Mental/Developmental Impairments in its entirety. The inspector found missing information including the time the form was completed, comments for affirmative answers, and CCQ return information. The inspector also found that the approved tuberculosis plan for the jail had expired the previous month. The inspector required jail administration to conduct documented training with staff on completing the screening form for suicide and medical/mental/developmental impairments in its entirety, such training to occur within the following 30 days.

6.     Suffering and Death of Other Detainees

92.     Other suffering and death in the Wichita County jail support *Monell* liability. On November 10, 2014, Brandon Walker was observed experiencing a medical emergency in his cell and was taken to the medical unit of the jail. He appeared to go into cardiac arrest and was taken to the hospital via ambulance, where he was pronounced deceased due to occlusive coronary atherosclerosis.

93.     On May 4, 2015, Ronnie Hutson was booked into the Wichita County jail and reported no "unusual conditions." Mr. Hutson was, however, observed sweating profusely and seizing after being placed in the main holding area. He admitted to ingesting methamphetamine and an ambulance was called, but he was later pronounced deceased at the emergency room.

94.     On February 14, 2017, Quantrell Hutchinson suffered injuries after an altercation with officers due to his trying to escape the jail. Pepper spray, a pepper ball launcher, and a taser were all used on Mr. Hutchinson, and he shortly after became unresponsive. He was taken to the hospital and placed on life support until February 24, 2017, when he was pronounced deceased due to "acute diffuse ischemic encephalopathy following cardiac arrest due to effects of cocaine use, psychiatric illness, and physiologic stress of physical altercation."

95.     On September 2, 2018, a welfare check was called for Joe Johnson after it was observed that he had not moved in approximately four hours. He was taken to the hospital, where medical staff discovered a brain bleed and promptly performed an operation to alleviate the pressure. Mr. Johnson remained on a ventilator until September 6, 2018, when he was pronounced deceased.

96.     On January 30, 2019, Bernard Grant was found unresponsive by the housing officer while delivering meal trays. Life-saving measures were performed until Mr. Grant could be

transferred to the hospital, where he was pronounced deceased. His death was deemed "accidental," although it is noted that Mr. Grant was experiencing medical problems on entry to the jail.

97.     On September 13, 2021, Cedric Hardesty was found unresponsive without a pulse in his housing unit. He was transported to the hospital, but was pronounced deceased by a medical provider at the hospital. Mr. Hardesty's cause of death was determined to be as a result of Covid-19 infection, and it is noted that he exhibited medical problems on entry to the jail on April 17, 2021.

98.     On September 15, 2021, Leo Lawrence was observed to be breathing heavily and was verbally unresponsive. Medical staff entered and began life-saving measures, but Mr. Lawrence was ultimately pronounced deceased on arrival at the hospital. His cause of death was later attributed to Covid-19.

99.     On October 28, 2022, Lawrence McKinzie suffered a medical emergency in his pod, where he was unable to stand and became unresponsive soon after staff entered to assist him. Medical staff attempted CPR and AED, though the AED never administered any shocks. Mr. McKinzie never regained consciousness and was pronounced deceased after being transported to the emergency room.

III.    Causes of Action

A.    14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson*

100.    In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), a pretrial detainee sued several jail officers alleging that they violated the 14th Amendment's Due Process Clause by using excessive force against him. *Id*. at 2470. The Court determined the following issue: "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively*

aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable." *Id.* (emphasis in original). The Court concluded that the objectively unreasonable standard was that to be used in excessive force cases, and that an officer's subjective awareness was irrelevant. *Id.* The Court did so, acknowledging and resolving disagreement among the Circuits. *Id.* at 2471-72. The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 2472. Instead, "courts must use an objective standard." *Id* at 2472-73. "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 2473. Thus, the Court required no *mens rea*, no conscious constitutional violation, and no subjective belief or understanding of offending police officers, or jailers, for an episodic claim but instead instructed all federal courts to analyze officers', or jailers', conduct on an objective reasonability standard. Since pretrial detainees' rights to receive reasonable medical and mental health care, to be protected from harm, and not to be punished at all, also arise under the 14th Amendment's Due Process Clause, there is no reason to apply a different standard when analyzing those rights.

101.    Thus, the trail leads to only one place – an objective unreasonableness standard, with no regard for any natural person's subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment. The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and apply an objective unreasonableness standard to appropriate constitutional claims in this case. The court should not apply a subjective state of mind and/or deliberate indifference standard. The Supreme Court discarded the idea that a pretrial detainee should have such a burden.

102.    This *Kingsley* section potentially applies, depending on the status of the law at application, only to any claims that ultimately might ever be asserted against natural persons, or

any episodic act and/or omissions claims against Wichita County and/or CorrHealth. Plaintiffs make no allegation or stipulation that deliberate indifference would necessarily be a requirement in such a situation. Regardless, deliberate indifference is not a requirement to show conditions of confinement claims against Wichita County and/or CorrHealth. Further, Plaintiffs currently have no intent to seek to add any natural persons as defendants to this case.

    B.    Remedies for Violation of Constitutional Rights

103.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983. Therefore, Plaintiffs seek, for causes of action asserted in this complaint, all remedies and damages available pursuant to Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting case law. If the decedent had lived, the decedent would have been entitled to bring a 42 U.S.C. § 1983 action for violation of the United States Constitution and obtain remedies and damages provided by Texas and federal law. Plaintiffs incorporate this remedies section into all sections in this complaint asserting cause(s) of action.

    C.    Cause of Action Against Wichita County and CorrHealth Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

104.    In the alternative, without waiving any other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendants Wichita County and/or CorrHealth are liable to Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs, pursuant to 42 U.S.C. § 1983, for violating the decedent's constitutional rights including but not

necessarily limited to those to receive reasonable medical/mental health care, to be protected, and/or not to be punished as a pre-trial detainee. These rights are guaranteed by at least the 14th Amendment to the United States Constitution. Pretrial detainees are entitled to be protected and not to be punished at all, since they have not been convicted of any alleged crime resulting in their incarceration. Regardless, Plaintiffs rely on the court to apply the correct constitutional guarantees to the facts pled as required by United States Supreme Court precedent.

105.    County's and CorrHealth's employees and agents acted or failed to act under color of state law at all relevant times. County's and/or CorrHealth's policies, practices, and/or customs were moving forces behind and caused, were producing causes of, and/or were proximate causes of the decedent's suffering, damages, and death, and all damages suffered by Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs.

106.    The Fifth Circuit Court of Appeals has made it clear that Plaintiffs need not allege the appropriate chief policymaker(s) at the pleadings stage. Nevertheless, out of an abundance of caution, the sheriff of County was County's relevant chief policymaker over matters at issue in this case. Moreover, in addition, and in the alternative, County's jail administrator was the relevant chief policymaker over matters at issue in this case. Finally, in addition, and in the alternative, County's commissioners' court was the relevant chief policymaker. Further, out of an abundance of caution, CorrHealth's relevant chief policymaker(s) over matters at issue in this case was or were its chief operating officer, president, vice president, physician-in-charge, and/or chief nursing officer, and/or someone in a similar position.

107.    County and/or CorrHealth were deliberately indifferent regarding policies, practices, and/or customs developed and/or used with regard to issues addressed by allegations set forth above, for any facts which are ultimately determined to support episodic act and/or omissions

claims, to the extent deliberate indifference is a necessary element or prerequisite to such claims at the time the court makes the determination. Deliberate indifference is not an element of a conditions of confinement claim. County and/or CorrHealth also acted in an objectively unreasonable manner. Policies, practices, and/or customs referenced above, as well as the failure to adopt appropriate policies, were moving forces behind and caused violation of the decedent's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur. Once again, by including the "deliberate indifference" allegation, Plaintiffs are not conceding or alleging that deliberate indifference is a necessary element of a conditions of confinement claim. It is not. County's and/or CorrHealth's relevant policies, practices, and/or customs, whether written or not, were also objectively unreasonable as applied to the decedent.

108.    Therefore, the decedent's estate and/or his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery, through the estate administrator, from County and CorrHealth:

- the decedent's conscious physical pain, suffering, and mental anguish;

- the decedent's loss of life and/or loss of enjoyment of life;

- the decedent's medical expenses; and

- the decedent's funeral expenses.

109.    Donna Diaz, individually, and Ms. Hovis, as estate administrator asserting claims on behalf of Wrongful Death Beneficiaries, also seek recovery from County and CorrHealth for all remedies and damages available to each Wrongful Death Beneficiary individually for claims asserted in this pleading. Ms. Diaz seeks such damages as a result of the wrongful death of her son, and Mr. Maxwell's minor child or children, referenced above, are entitled to such damages as

a result of the wrongful death of their father. County's and/or CorrHealth's policies, practices, and/or customs caused, were proximate and/or producing causes of, and/or were moving forces behind and caused the following damages suffered by these people, for which each individually seeks compensation, whether as a party to this case or through another party asserting claims for such relief in some representative or other legally-appropriate capacity:

- past mental anguish and emotional distress suffered by each resulting from and caused by the decedent's death;

- future mental anguish and emotional distress suffered by each resulting from and caused by the decedent's death; and

- loss of companionship and/or society, as applicable, that each would have received from the decedent.

Moreover, Plaintiffs seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

IV.    Concluding Allegations and Prayer

A.    Conditions Precedent

110.    All conditions precedent to assertion of all claims herein have occurred.

B.    Use of Documents at Trial or Pretrial Proceedings

111.    Plaintiffs intend to use at one or more pretrial proceedings and/or at trial all documents produced by Defendants in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).

C.    Jury Demand

112.    Plaintiffs demand a jury trial on all issues which may be tried to a jury.

D.    Prayer

113.    For these reasons, Plaintiffs ask that Defendants be cited to appear and answer, and that Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs have judgment for damages within the jurisdictional limits of the court and against Defendants, jointly and severally, as legally available and applicable, for all damages referenced above and/or below in this pleading:

a)    actual damages and including but not necessarily limited to for:

- the decedent's medical expenses;

- the decedent's funeral expenses;

- past mental anguish and emotional distress suffered by each Wrongful Death Beneficiary resulting from and caused by the decedent's death;

- future mental anguish and emotional distress suffered by each Wrongful Death Beneficiary resulting from and caused by the decedent's death;

- loss of companionship and/or society, as appropriate, with the decedent suffered by each Wrongful Death Beneficiary resulting from and caused by the decedent's death;

- the decedent's conscious physical pain, suffering, and mental health anguish; and

- the decedent's loss of life and/or loss of enjoyment of life;

b)    reasonable and necessary attorneys' fees through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988;

c)    court costs and all other recoverable costs;

d)    prejudgment and postjudgment interest at the highest allowable rates; and

e)    all other relief, legal and equitable, general and special, to which Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs are entitled.

Respectfully submitted:


Law Offices of Dean Malone, P.C.


_____/s/ T. Dean Malone_____
T. Dean Malone

T. Dean Malone
Attorney-in-charge
dean@deanmalone.com
Texas State Bar No. 24003265
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:    (214) 670-9989
Telefax:        (214) 670-9904

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
michael.oconnor@deanmalone.com
Jennifer Kingaard
Texas State Bar No. 24048593
jennifer.kingaard@gmail.com
Alexandra W. Payne
Texas State Bar No. 24118939
alexandra.payne@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:      (214) 670-9989
Telefax:          (214) 670-9904

Attorneys for Plaintiffs