UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TIFFANY HOVIS, as dependent administrator of and on behalf of the ESTATE OF MATTHEW RAY MAXWELL, and MATTHEW RAY MAXWELL's heir(s)-at-law and wrongful death beneficiaries; and DONNA DIAZ, individually, | § § § § § § § | CIVIL ACTION NO. 3:23-cv-2220-L |
| Plaintiffs, | § § | JURY DEMANDED |
| v. | § § | |
| WICHITA COUNTY, TEXAS; and CORRHEALTH, PLLC A/K/A CORRHEALTH, | § § § § | |
| Defendants. | | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

> **Deathly ill pretrial detainee Matthew Ray Maxwell horribly suffered and died an unnecessary and preventable death from a bowel obstruction while incarcerated in the Wichita County jail as a result of Defendants' policies, practices, and customs.**



Table of Contents

I.      Introductory Allegations ...................................................................................4

    A.      Parties.................................................................................................4

    B.      Jurisdiction and Venue.......................................................................5

II.     Factual Allegations ...........................................................................................6

    A.      Preliminary Statements ......................................................................6

    B.      Matthew's Suffering and Death in the Wichita County Jail ..............7

        1.      General Timeline ....................................................................7

        2.      Matthew's Suffering Seen on Video......................................14

        3.      Texas Rangers Investigation .................................................19

        4.      Texas Commission on Jail Standards Investigation...............20

        5.      Custodial Death Report (Filed with Attorney General).........20

        6.      Inmate Death Report (Filed with TCJS) ...............................21

        7.      Medical Records ....................................................................22

            a.      EMS Records ..............................................................22

            b.      Autopsy Report ...........................................................22

    C.      Liability of Wichita County and CorrHealth .....................................24

        1.      Introduction............................................................................24

        2.      CorrHealth's Agreement and Partnership with Wichita County .........25

        3.      Nondelegable Duties and Respondeat Superior....................33

        4.      Wichita County and CorrHealth Policies, Practices, and Customs .....36

        5.      TCJS Records Demonstrating County Policies, Practices and Customs..................................................................................39

        6.      Suffering and Death of Other Detainees ...............................44

III.    Causes of Action ..............................................................................................47

    A.      Fourteenth Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson* ...................47

    B.      Remedies for Violation of Constitutional Rights...............................48

    C.      Cause of Action Against Wichita County and CorrHealth Under 42 U.S.C. § 1983 for Violation of Constitutional Rights .................................49

IV.     Concluding Allegations and Prayer .................................................................51

    A.      Conditions Precedent .........................................................................51

    B.      Use of Documents at Trial or Pretrial Proceedings ..........................52

C.    Jury Demand ................................................................................................. 52

D.    Prayer ............................................................................................................ 52

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiffs file this complaint and for cause of action will show the following.

I.     Introductory Allegations

A.     Parties

1.     Tiffany Hovis sues as the dependent administrator of the Estate of Matthew Ray Maxwell, Deceased. Ms. Hovis, when asserting claims in this lawsuit as the dependent administrator, does so in that capacity on behalf of all wrongful death beneficiaries, including Donna Fox, formerly known as Donna Diaz and female minor N.J.M. (daughter of Matthew Ray Maxwell) and potentially on behalf of male minor C.L.M (possible son of Matthew Ray Maxwell) (collectively, the "Wrongful Death Beneficiaries"). Ms. Hovis seeks all wrongful death and other damages available to the Wrongful Death Beneficiaries under law. She also sues in that capacity asserting claims on behalf of the estate and all of Mr. Maxwell's heirs, including N.J.M. and potentially including C.L.M (collectively, the "Claimant Heirs"). Ms. Hovis seeks all survival and other damages available to the Claimant Heirs under law. Ms. Hovis qualified as dependent administrator in Cause Number CCL2-PR2023-0097, in the County Court at Law No. 2 of Wichita County, Texas, in a case styled *Estate of Matthew Ray Maxwell, Deceased.*

2.     Plaintiff Donna Fox, formerly known as Donna Diaz, is a natural person who is the biological and legal mother of Matthew Ray Maxwell. Matthew Ray Maxwell is referred to herein at times as "Mr. Maxwell," "Matthew," or the "decedent." Ms. Fox sues in her individual capacity and seeks all damages and remedies available to her as a wrongful death beneficiary and/or heir.

3.     Defendant Wichita County, Texas ("Wichita County" or the "County") is a Texas county that was served with process and made an appearance in this case. The County acted or failed to act at all relevant times through CorrHealth, PLLC and County employees, agents, representatives, jailers, and/or chief policymakers, who all acted under color of state law at all

relevant times, and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983). The County's and/or CorrHealth, PLLC's policies, practices, and/or customs were moving forces behind, and caused, were proximate causes of, and were producing causes of, constitutional violations and resulting damages (including death) referenced in this pleading.

4.      Defendant CorrHealth, PLLC a/k/a CorrHealth (sometimes referred to herein as "CorrHealth") is a Texas professional limited liability company that was served with process and made an appearance in this case. CorrHealth acted at all times under color of state law, and its policies, practices, and/or customs were moving forces behind and caused constitutional violations and resulting damages (including death) referenced in this pleading.

B.      Jurisdiction and Venue

5.      The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. §§ 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statute(s) providing for the protection of civil rights. This suit arises under the United States Constitution and 42 U.S.C. § 1983. The court has personal jurisdiction over the County because it is a Texas county. The court has personal jurisdiction over CorrHealth because, including but not limited to, CorrHealth's minimum contacts with Texas are such that CorrHealth would expect to be subject to the court's jurisdiction. Venue is proper in the Dallas Division of the United States District Court for the Northern District of Texas, pursuant to 28 U.S.C. § 1391(b)(1). Venue is proper in a judicial district in which any defendant resides, if all defendants are residents of the state in which the district is located. Both Defendants are residents of Texas, and Defendant CorrHealth has its primary office and place of business in, and is a resident of, Dallas, Texas. Therefore, CorrHealth has its primary office and principal place of business in the Dallas Division of the United States District Court for the Northern District of Texas.

II.    Factual Allegations

   A.    Preliminary Statements

6.    Plaintiffs provide in factual allegations sections below the general substance of certain factual allegations. Plaintiffs do not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations. Rather, Plaintiffs intend that those sections provide Defendants sufficient fair notice of the general nature and substance of Plaintiffs' allegations, and further demonstrate that Plaintiffs' claims have facial plausibility. Whenever Plaintiffs plead factual allegations "upon information and belief," Plaintiffs are pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. Moreover, where Plaintiffs quote a document, conversation, or recording verbatim, or provide a person's name, Plaintiffs have done their best to do so accurately and without any typographical errors. However, some typographical errors may still exist.

7.    Plaintiffs plead facts which give rise to, and thus assert, conditions of confinement claims. Conditions of confinement claims require no deliberate indifference on behalf of a governmental entity or governmental actor. In the alternative, Plaintiffs plead facts which give rise to episodic acts and/or omissions claims. Regardless, pursuant to United States Supreme Court authority, Plaintiffs need not assert in this pleading specific constitutional claims but rather must merely plead facts which give rise to constitutional claims. Plaintiffs thus ask the court to apply the correct legal theories to the facts pled.

8.    Plaintiffs are not pleading their "best case" and will only be able to do so after conducting discovery. Plaintiffs do not intend to "stand" on this pleading but will seek leave to amend as further facts are developed, or in the event any court determines that Plaintiffs' live pleading is any manner deficient.

B.     Matthew's Suffering and Death in the Wichita County Jail

1.     General Timeline

9.     Plaintiffs provide in this portion of the brief some general factual allegations, in a rough timeline, of the morning of April 1, 2022. Plaintiffs provide in another section below more specific facts about the horrendous suffering Matthew experienced as a result of his bowel blockage for at least six hours on the morning of April 1 concluding in his death.

10.     Matthew unnecessarily suffered for hours before his preventable death on or about April 1, 2022, as a result of being incarcerated in the County jail. Upon information and belief, the jail was located at 2815 Central Freeway East, Wichita Falls, Texas 76302. Defendants' policies, practices, or customs caused, were proximate causes of, were producing causes, and were moving forces behind Matthew's suffering and death and all other damages referenced in this complaint. This section provides only some material facts related to Matthew's suffering and death.  Plaintiffs set forth other material facts related to Matthew's suffering and death in other portions of this complaint.

11.     Matthew, 32 years old, was arrested on March 28, 2022, by a Wichita Falls Police Department officer. The officer had received a call about a suspicious person and located Matthew. The officer conducted a records check and found that Matthew had outstanding warrants. Matthew was transported to and incarcerated in the County jail. Upon information and belief, Matthew was a pretrial detainee.

12.     CorrHealth electronic medical records, in CorEMR software, indicate that on April 1, 2022, Matthew was experiencing severe pain. The records indicate that at 6:15 a.m., Matthew reported to Bonnie Shavers, who was upon information and belief a CorrHealth employee, that his pain was at a "10" on a scale of 1-to-10 in the right upper quadrant of his body, left upper quadrant of his body, and midline. Records also indicate that Matthew's 10-out-of-10

pain level was constant. Associated symptoms listed by Ms. Shavers were upper abdominal pain on both sides. A portion of a form for entry of vital signs was left blank, even though it was required to be completed,. A note typed into a "general appearance" row read, "Unable to stand erect (PT WILL NOT STOP MOVING)." Pain was induced with gentle abdominal palpitations in Matthew's upper bilateral quadrants and also induced when Matthew walked.

13.     The records indicate that Matthew was only constipated. The records fail to indicate that Matthew had been screaming in pain and was doubled over. It was apparent not only to the trained medical personnel, but even the non-trained laypeople, that Matthew was not just constipated and needed more than cursory or minimal, ineffective treatment through over the counter medication used for minor stomach issues. Matthew obviously needed to be taken to a local emergency room for evaluation through including but not limited to appropriate X-rays and/or CT scans, and ultimately for life-saving surgery. People who are constipated, while experiencing discomfort, can generally continue to perform their normal tasks of daily living, including working and conducting other physical activity. This was not true for Matthew, as is further shown below, and it was evident to everyone who had knowledge of his condition.

14.     Matthew needed medical treatment to resolve the bowel blockage which would cause severe pain for hours and ultimately cause his untimely death. However, Ms. Shavers simply gave Matthew milk of magnesia. This amounted to cursory or minimal, ineffective treatment, in other words no treatment at all, for a serious medical condition resulting in Matthew screaming and being doubled over in pain. Only providing milk of magnesia in Matthew's circumstances is not reasonable behavior by medical personnel or laypeople. All reasonable people having a friend or relative experiencing such symptoms would immediately seek medical treatment at a local hospital. If that had happened here, Matthew would have received anesthesia and ultimately

surgery, resulting in significantly less suffering and his life being saved. Instead, Matthew's obvious serious medical needs were disregarded, resulting in an excessive risk to his safety and ultimately his death.

15.     At approximately 6:45 a.m., Wichita County Sheriff's Office Corporal J. Price received a call from detention officer Joshua Jackson (# 4667) in L-pod regarding Matthew. Officer Jackson said that Matthew was in pain and doubled over in the shower. Officer Jackson said that he called "Medical," which was upon information and belief CorrHealth, and told Medical that Matthew was having stomach pain. Instead of responding, Medical told Officer Jackson to "put a sick call in."

16.     Approximately three minutes later, Corporal Price arrived at L-pod and went to the shower to talk to Matthew. Matthew was in the shower screaming and doubled over in pain. Corporal Price told Matthew that he would contact Medical again. Corporal Price then went to the officer station to contact Medical, presumably CorrHealth.

17.     Corporal Price spoke with LVN Josh Simpkins. He told LVN Simpkins he knew that Officer Jackson had called about Matthew, but that he (Corporal Price) wanted Medical to come and assess Matthew due to him being doubled over in pain and screaming. Simpkins, upon information and belief a CorrHealth employee, spoke with someone else in Medical and allegedly said it was not an emergency. Simpkins said that a sick call was already in place for Matthew to see a doctor "in the morning." Corporal Price said he understood but felt that the situation had changed. Corporal Price also said would call a medical emergency to L-pod if someone was not going to do an assessment of Matthew. Thus, any medication supposedly provided to Matthew clearly was not working. Matthew had continued to get progressively worse, as was evident even

to a non-medical layperson. Thus, it was evident to everyone in the jail who had contact with or knowledge about Matthew that he needed emergency medical treatment.

18.     LVN Simpkins then spoke with someone else in Medical. LVN Samantha Hall then joined the phone call. LVN Hall said that they were told by their bosses, upon information and belief higher-level or management employees at CorrHealth, that jailers could not threaten to call a medical emergency and in doing so get a nurse to go to the pod. Corporal Price told them in substance, "Fine," and that he was going to get Matthew dressed and bring him down to Medical. Corporal Price then hung up the phone. Corporal Price realized Matthew's dire state and wanted someone to do something about it. When medical personnel failed or refused to do so, he decided to take action. Corporal Price took Matthew to Medical, which required some assistance for Matthew to be able to walk. Once in Medical, Detention Officer Caesar Cabrera (#4584) took over for Corporal Price. Corporal Price returned to the report room to conduct shift change. Upon information and belief, shift change occurred at 7:00 a.m. Matthew was moved to and held in medical segregation cell X-105 at some point, which is where he would suffer for several hours and die. Jailers and medical personnel could easily see into the cell, as there was a vertical window in the cell door and a large vertical window next to the cell door.

19.     Matthew vomited up the milk of magnesia, which further shows that it was cursory or minimal, ineffective treatment. In other words, it amounted to no medical treatment at all. Detention officer Georgeana Latham (#4677) was working in the medical segregation unit at the jail on April 1, 2022. She related that, at approximately 7:40 a.m., Matthew was brought to medical segregation complaining of severe stomach pain. She noted that he had been given milk of magnesia but that he vomited it up shortly thereafter. Detention officer Kameron Young (#4454) was working the same shift as detention officer Latham. Detention officer Young confirmed that

Matthew had been complaining of severe stomach pain. Officer Young? also confirmed that, after administration of milk of magnesia, Matthew vomited it up.

20.      Nicole Hooper indicates that, at approximately 8:10 a.m., she was asked to evaluate Matthew for abdominal cramping. Matthew was standing in his cell, naked. This was another indicator of the severe pain and discomfort he was experiencing. As more specifically described elsewhere in this pleading, Matthew was removing clothes, manipulating clothing, manipulating a blanket, and doing anything he could to try to dull or resolve the excruciating pain. According to one or more other witnesses, Matthew was becoming worse, not getting better. This was likely roughly one-and-a-half to two hours or so after he had been given milk of magnesia (which he vomited up) and had been found doubled over screaming in pain. Ms. Hooper saw feces smeared on the bed mat. Matthew's blood pressure was now dangerously high, at 180/110.

21.      All reasonable medical personnel and all reasonable laypersons would have called for EMS to have Matthew transported to a local emergency department for treatment. Matthew had been screaming, doubled over in pain, and now his blood pressure was in an emergency treatment range. Instead, upon information and belief to avoid expense which would be incurred by CorrHealth and/or County, blood pressure medication was administered. Matthew was also provided an enema and additional stomach medication. Detention officer Kameron Young indicated that, after giving Matthew the blood pressure medication and additional stomach medication, as he had done with the milk of magnesia, Matthew vomited up the medication. Thus, there was no doubt that Matthew was so sick that he could not keep medication down and his body was unable to use or synthesize the medication given to him. Since Matthew vomited up all medication provided to him, the medication provision amounted to cursory or minimal, ineffective

treatment. In other words, it constituted no medical treatment at all. It continued to be obvious that Matthew needed emergency medical treatment.

22.     Interestingly, the entry by Ms. Hooper was not made until 1:37 p.m., well after Matthew died. The entry should have been made shortly after the alleged occurrence at 8:10 a.m. that morning. The failure to do so violated all known medical and correctional medicine standards. The late entry also gives rise to an inference that it may have been drafted in a light most favorable to Defendants and in a manner not entirely candid.

23.     Further, the increased blood pressure would set off alarm bells in any person. Matthew's blood pressure was 111/76 on March 28, 2022 at 2:44 p.m., and it was 130/66 at 6:15 a.m. on April 1, 2022. Matthew's blood pressure was thus typically normal. It increased after he began experiencing pain at a level of 10-out-of-10. According to medical records, by 7:25 a.m. on April 1, 2022, Matthew's blood pressure had increased to 188/120. Matthew was in such pain at the time, according to medical records, that medical personnel were unable to obtain his heart rate due to Matthew being "too restless." This was due to his severe pain. Matthew could not help himself. Matthew undoubtedly wanted to resolve his pain and obtain treatment, so he would not have been intentionally restless to avoid his heart rate being taken. If Matthew were that restless because of his medical condition and pain, he should have been transported to a local emergency room.

24.     Officer Latham and Officer Young confirmed, contrary to a meal log, that Matthew refused his lunch tray at roughly 11:44 a.m. and was still complaining about abdominal pain. Officer Latham called CorrHealth personnel at approximately noon to tell them that Matthew could not breathe and was coughing up blood.

25.     Approximately six hours after Defendants became aware that Matthew was suffering with pain at a level of 10-out-of-10, doubled over, and screaming, Officer Latham finally called a medical emergency. This occurred at approximately 12:18 p.m., to the medical segregation cell in which Matthew was incarcerated. Matthew had shortness of breath, and medical personnel could see through the cell observation window that Matthew was vomiting clear liquid onto the floor. It was too late for Matthew, as he would be deceased in a matter of minutes. Before personnel entered Matthew's cell, Matthew slumped over and became unresponsive. CPR was started shortly thereafter, and Ms. Gallardo said, "Medical emergency, starting CPR, call 911 now." The AED device did not advise a shock. It was far too late for Matthew to receive medical treatment.

26.     Another portion of CorrHealth's medical records, completed or entered at roughly 2:57 p.m. on April 1, 2022, regarding Matthew's death occurring between roughly 12:13 and 12:18 p.m., provided further evidence of Matthew's immediate death after roughly six hours of excruciating pain. After Matthew slumped over and lost consciousness, a nurse immediately checked for his pulse. The nurse found no blood pressure reading. Matthew had no pulse. Matthew had no respiration. Matthew was deceased.

27.     Matthew died at the jail. Upon information and belief, jailers at the scene wanted to "call" the fact that Matthew was deceased at the jail but were not allowed to do so by one or more supervisors. Supervisors apparently wanted Matthew's death to be "called" at the hospital to attempt to avoid liability for his suffering and death. This is further direct and circumstantial evidence that Matthew's serious medical needs were ignored, and/or he was intentionally treated improperly as a result of, potentially in part, financial pressures to minimize the cost of providing detainee medical care. The minimal provision of medication, which Matthew vomited up, when considered in light of his suffering described in this pleading, was grossly incompetent, clearly

inadequate, and amounted to intentionally treating him improperly or providing cursory or minimal, ineffective treatment, in other words, no care at all.

### 2.    Matthew's Suffering Seen on Video

28.      Plaintiffs were able to obtain video recordings of the medical segregation cell in which Matthew was incarcerated for the last several hours of his life. A true and correct copy of the video recordings are provided to the Court contemporaneously with the filing of this first amended complaint and incorporated as Exhibit A by reference into the complaint. No matching audio recordings were available to Plaintiffs. Upon information and belief, one or more employees of Defendants were able to see the video feed for the entire several-hour time period described below, and they could have taken action based on it. Unfortunately, the video recordings do not contain time stamps. Therefore, in this section of the pleading, Plaintiffs address what occurred during roughly 30-minute segments over the last several hours of Matthew's life. Plaintiffs refer to certain persons seen in videos as "jailers" for simplicity. Such persons could be jailers or in the alternative medical personnel employed by the County and/or CorrHealth.

29.      **The first approximate half hour**. Matthew is seen entering the bathroom and exiting only three minutes later. He immediately goes to the block jailer and appears to ask for help. He is obviously already in a large amount of pain as he is doubled over and even falls to the floor while speaking with the jailer. While the jailer makes some phone calls, Matthew goes back to a bathroom stall. He can be seen clutching the wall at one point. He struggles to exit the stall, falling backward a few times until another inmate comes to check on him. While the videos have no audio, it is apparent that Matthew may be crying out in pain, since several other inmates get out of their bunks to observe the situation unfolding. Matthew exits the stall with his pants around his ankles and moves to a shower stall to clean himself up. An inmate again checks on Matthew while in this stall and carries out an article of his clothing. Matthew then moves to a smaller shower stall,

one without a curtain, and continues washing himself. He uses the wall for support as he stands until an inmate brings him a shower chair to sit on. A jailer speaks with Matthew while he sits in the shower, wobbling and rocking back and forth, unable to focus on the jailer with the amount of pain he is in. Matthew is clearly under an extreme amount of pain – rocking, holding his abdomen, face twisted in pain. He gets out of the shower chair, only to fall to his knees in pain. The chair in front of him moves and he lays flat for a moment before standing to put on a new jumpsuit. This is not done without struggle—Matthew falls and doubles over many times while attempting to dress himself. Once dressed, Matthew is escorted to the medical segregation cell with assistance from jailers.

30.    **The next approximate half hour**. Matthew is escorted to the medical segregation cell and before even entering the cell, he must use the wall to steady himself. He is fully doubled over in pain and is unable to stand straight. He immediately stumbles to the bed in pain. Matthew is seen in his bed, clutching his stomach in pain. He sits up and lies back down multiple times and is visibly grimacing. He stands and leans over the toilet as if he is throwing up or attempting to do so. The censor bar, which automatically "blacks out" portions of the video for modesty reasons, makes it impossible to tell if he does in fact vomit. During this, the top of his jumpsuit comes undone. He then begins rocking himself on the edge of his bunk, clutching his stomach as if to alleviate some of the pain. He paces around his room again, leans over his bed, and pulls his jumpsuit down to his waist. After several minutes, he attempts to lie down, but he quickly moves back to the toilet once again. He uses the walker next to the toilet for support as he is unbalanced and unable to sit or stand straight. His face is red, and he is visibly sweating. He appears to vomit again and lies back down only for a moment before going back to the toilet. During this, his jumpsuit comes completely off. Matthew makes no effort to put it back on. He periodically paces

around his cell, leaning over the bed, desk, and shower area, as if at a loss of what to do. By the end of the 30-minute period, Matthew is lying in his bunk. While multiple staff members have passed his cell, none appear to have made contact with Matthew.

31.    **The next approximate half hour**. Matthew lies in bed for a few moments, clutching at his stomach and rolling around in pain. He appears to accidentally smear feces on himself but does not notice or care given his situation. He sits on the toilet for another few minutes before attempting to lie down again. At this point, the jailer stationed outside of Matthew's cell looks in, and Matthew appears to be trying to explain the amount of pain he is experiencing. The jailer returns to his or her seat, and Matthew returns to the toilet. He stands, bends, and squats while stabilizing himself on his bed attempting to alleviate the pain. He lies down once again, but his pain clearly does not subside, as he begins the cycle of rocking himself and pacing all over again. Medical staff arrive and talk to Matthew through the cell intercom, but Matthew is unable to stop moving due to the amount of pain he is experiencing. A jailer watches as he doubles over onto his table, shaking and fighting to stay upright. Matthew manages to put his jumpsuit back on most of the way, but not without falling and needing to sit down. Medical staff enters his cell to check his blood pressure and check on his abdomen by listening to it and feeling it. Even while being examined, Matthew is beside himself in pain. A jailer leaves an object on his table, but Matthew does not take it. Instead, he begins another cycle of lying down, sitting up, standing, and lying back down. This continues for several minutes, all the while Matthew is shaking and appearing to try to brace himself against the immense amount of pain he is in. Staff return and talk to Matthew through the meal slot and give him something, which he takes with water.

32.    **The next approximate half hour**. This unfortunately provides Matthew with no relief. He lies down after pacing his cell and pulls his blanket over his head in an attempt to get

some sleep. Even while trying to rest, Matthew is writhing in pain. It is unlikely that Matthew gets any sleep given the frequency he moves around trying to find a more comfortable position. A jailer makes contact with Matthew, but Matthew is still forced to wait out his pain. His pain appears to become somehow worse based on how much more often he is seen pacing around his room and clutching his stomach in pain.

33.    **The next approximate half hour**. Matthew vomits into the toilet several times, but this again provides no relief. He lies down and stands up several more times, constantly rubbing and clutching his stomach in agony. Medical staff arrive and provide Matthew with an enema, which he immediately uses in the shower before sitting on the toilet. He appears to struggle to expel the liquid solution as he rocks on the toilet in obvious pain. He again uses a walker next to the toilet to support himself, too weak to sit without assistance.

34.    **The next approximate half hour**. Matthew moves back to bed, in far too much pain to put his jumpsuit back on. Unable to rest, he returns back to the toilet almost instantly. A staff member speaks with him briefly through the cell intercom while he sits in pain on the toilet. He is seen clutching the walker again, bracing himself for the waves of pain he is experiencing. He paces around and returns to the toilet with a blanket to cover his head, as if even the light and seeing his surroundings are too much stimulation for the amount of pain he is suffering. He returns to bed for only a moment, twitching and visibly breathing heavily before returning to his spot on the toilet, covered by his blanket. After several minutes, jail staff attempt to get his attention from outside of the cell before entering with medical staff.

35.    **The next approximate half hour**. Matthew's blood pressure is taken once again, and it appears that he is given some liquid to drink. After this, he is able to lie down for a few minutes, but sits up once again in pain before getting any real rest. He sits back down on the toilet,

then tries once again in vain to get some rest. He repeats this process many times and at no point shows any sign of relief from his pain. He taps the window of his cell and presses the intercom button while lying down.

36.     **The next approximate half hour**. After attempting to relieve himself and get some rest again, Matthew taps on his cell window. He speaks with a jailer, unable to even sit up while he apparently asks for help. He can be seen clutching his stomach and rocking back and forth while lying down attempting to ease the pain. While sitting on the toilet again, he appears to faint and hits the ground. He sits on the toilet again after a few moments and begins to hit his stomach in frustration. Matthew attempts to use the shower but has to sit down multiple times due to his pain being too intense to stand, eventually resorting to bringing a chair into the shower to sit while attempting to rinse off. He lies back down after his shower, not able to dry anything but his face. He pulls his blanket over his head to block out his surroundings attempting to rest.

37.     **The next approximate half hour**. Matthew tries for several minutes to rest but presumably is unsuccessful given the amount he moves around. He continues his cycle of attempting to rest and trying to use the restroom, all the while doubled over in pain.

38.     **The next approximate half hour**. Matthew presses against his stomach, seemingly attempting to relieve some of the pain he has been experiencing for hours. He tries again to get help from the jailer stationed right outside of his cell, but it does not appear that his contact with the jailer leads to any help. Matthew sits up and leans against the wall before falling over, unable to keep himself upright. He appears to be spitting up a clear liquid as he lies limply on his bed. He twitches and tenses his body a few times and is able to move his legs onto the bed but is otherwise motionless for several minutes. During this, two jailers can be seen talking directly outside of Matthew's cell, backs turned to his suffering.

39.    **The next approximate half hour**. Matthew finds the strength to move to the toilet where he again clutches the walker for support. He is becoming visibly weaker, moving much less than before. He tilts his head towards the ceiling and hits the wall as a display of the agony he is in. He hits his cell window and presses the intercom button, desperate for help. Despite numerous jailers passing his cell, nobody arrives to help for several minutes. Matthew is seen breathing heavily, clutching his stomach, and trying again to get the attention of the jailers posted outside of his cell. He appears to then begin gasping for air, struggling under the immense pain he is in. This leads to him falling to the ground, and his depleting strength is apparent even as he pulls himself back into bed. Medical staff appear outside his cell. They do not enter.

40.    **The last approximate half hour**. Medical staff seem to hesitate to enter the cell as Matthew vomits and slowly lies back onto his bed. His entire body is experiencing tremors until he becomes still and rigid. He becomes unresponsive before any staff members enter his cell. Once he is unresponsive, there are suddenly close to a dozen staff members available to help him. Multiple staff members attempt CPR on him both in the cell and on the way to the ambulance, but Matthew never regains consciousness.

### 3.    Texas Rangers Investigation

41.    The Texas Rangers investigated Matthew's death. The purpose of a Texas Rangers investigation of a custodial death, such as Matthew's, is to determine whether there was any criminal responsibility for what occurred. Texas Rangers do not determine whether there is civil liability for violation of a person's constitutional rights, such as that alleged in this case. Therefore, the Texas Rangers' determination as to whether to turn the case over to a grand jury and recommended prosecution does not determine whether Defendants are liable for Matthew's death.

42.    Ranger Matthew Kelly investigated Matthew's death and initially spoke with Wichita County Sheriff's Office Chief Deputy Will Rutledge. Chief Deputy Rutledge admitted

that Matthew was transported to United Regional Hospital after suffering a medical emergency in the jail. Chief Deputy Rutledge also admitted that Matthew had complained of stomach pain during the morning of April 1, 2022, and Chief Deputy Rutledge alleged that Matthew's symptoms became progressively worse before he was transported to the hospital. He made it sound as if Matthew were still ill when he was transported to the hospital. Matthew was dead. He did not become "progressively worse" but suffered severe pain all morning on April 1, 2022. Emergency surgery that morning would have saved his life.

43.    Ranger Kelly also noted that Matthew was pronounced deceased by Wichita County Justice of the Peace James Hughes at 1:02 p.m. on April 1, 2022. When Ranger Kelly photographed the cell in which Matthew had been held, he saw a significant amount of toilet paper in the toilet with what appeared to be blood.

### 4.    Texas Commission on Jail Standards Investigation

44.    The Texas Commission on Jail Standards ("TCJS") conducted an investigation of Matthew's death. The TCJS regularly conducts investigations of custodial deaths in Texas county jails, and it is the state agency charged with enforcing bare minimum jail standards. However, despite Public Information Act requests, at the time this complaint was finalized, Plaintiffs were unable to obtain documents or evidence related to that investigation. It is Plaintiffs' understanding that Wichita County told TCJS it objected to TCJS releasing records pursuant to the Public Information Act. Thus, Plaintiffs will need to conduct discovery to obtain evidence that Wichita County apparently attempted to keep from Plaintiffs' counsel.

### 5.    Custodial Death Report (Filed with Attorney General)

45.    The Wichita County Sheriff's Department filed a custodial death report with the Attorney General of Texas. The custodial death report was completed by Lisa Patterson with the Wichita County Sheriff's Office and dated April 7, 2022, at 11:40 a.m. The report indicated that

Matthew was originally taken into custody at the County jail at 12:52 p.m. on March 28, 2022, and that he passed away at 1:02 p.m. on April 1, 2022. In response to the question, "Had the decedent been receiving treatment for the medical condition that caused the death after admission to your jail's jurisdiction," the response was "Unknown." The report admits that the event causing Matthew's death occurred at the County jail, located at 2815 Central Freeway East, Wichita Falls, Texas 76302.

46.    The report admits that Matthew was not a security risk, as he did not display or use weapons, attempt to injure others, barricade himself or initiate a standoff, resist being handcuffed or arrested, physically assault or attempt to assault officers, verbally threaten anyone else, including officers, attempt to gain possession of an officer's weapon, or escape or attempt to escape from custody. The summary indicates that Matthew was transported to United Regional Healthcare System Hospital in Wichita Falls by AMR.

### 6.    Inmate Death Report (Filed with TCJS)

47.    Plaintiffs expect that the County filed an Inmate Death Report with the TCJS. However, after numerous attempts to obtain records pre-suit from the TCJS, Plaintiffs were unsuccessful. It is Plaintiffs' understanding that one or more County officials told the TCJS that the County objected to production of such records sought pursuant to the Public Information Act. Therefore, after discovery, Plaintiffs may seek to re-plead to add additional allegations which will likely become apparent after review of records obtained through the discovery process: it is exceedingly rare for a plaintiff to have access to or personal knowledge of specific details

regarding the existence or absence of a defendant's internal policies or training procedures before discovery.

### 7.    Medical Records

#### a.    EMS Records

48.    EMS records indicate that EMS responded to a nonresponsive inmate, Matthew, and that care was transferred to AMR at approximately 12:21 p.m. on April 1, 2022. CPR by AMR was started at that time. Records further indicate that Matthew was not breathing and had an AED attached to him. Records seem to indicate that Matthew was transported to the hospital at approximately 12:31 p.m. from the Wichita County jail.

#### b.    Autopsy Report

49.    The Office of the Medical Examiner in Dallas County, at the Southwestern Institute of Forensic Sciences at Dallas, conducted an autopsy of Matthew. The autopsy report findings indicated in part that Matthew had small bowel ischemia and infarction due to a small bowel obstruction. The findings also indicated that approximately one-half of Matthew's small intestines appeared ischemic and infarcted. Findings also indicated a possible small bowel volvulus with constriction of the small bowel mesentery. The history included the understanding that Matthew had complained of "severe abdominal pain and started vomiting." History also indicated that Matthew was unresponsive when arriving at the hospital and unable to be resuscitated. Dr. Stephen Lenfest, M.D., a medical examiner in Dallas County, provided the following conclusion: "Based on the case history and autopsy findings, it is my opinion that Matthew Ray Maxwell, a 32-year-old male, died as a result of complications of small bowel ischemia and infarction due to small bowel obstruction."

50.    Death investigation records obtained from the Dallas County Medical Examiner's office contain notes of one or more interviews by an apparent investigator, Ryan Ward. Notes

indicate that a physician, according to Ranger Kelly, pronounced Matthew as being deceased at 1:32 p.m. on April 1, 2022. Further, Justice of the Peace Hughes pronounced Matthew deceased at 2:29 p.m. As indicated elsewhere in this pleading, Matthew was deceased before 12:30 p.m. on April 1, 2022.

51.     Ward noted that Ranger Kelly told him in part that, on the morning of April 1, 2022, at 6:00 a.m., Matthew "exhibited odd behavior in a private shower. He was on video complaining of abdominal pain and sweating profusely. He refused to keep on his clothes and started vomiting blood that progressively got worse. [Matthew] was taken to the infirmary and given anti-nausea medications. His blood pressure was high. [Matthew became] unresponsive and CPR was started by the nurse. He was transported to [the] hospital at 1218 hours and arrived to the [Emergency Department] at 1230 hours. There were no surgical interventions."

52.     Ward further reported that Matthew had not been taken to the jail infirmary after sweating profusely and complaining of abdominal pain. Instead, he was simply taken to a medical cell "for observation" where he was seen by a nurse. Steven Lenfest was purportedly told by Ranger Kelly that Matthew "had vague complaints of not feeling well around 0600 on 04/01/2022, and pretty quickly complained of severe abdominal pain and started vomiting. He was immediately moved to a medical cell for observation. [Matthew] took off all his clothes and was complaining of being hot." The allegation of "vague complaints" was false. One or more other people reporting what Matthew complained about initially on the early morning of April 1, 2022, and even Ranger Kelly himself, indicated that Matthew complained of severe pain. In fact, as described elsewhere in this pleading, one other witness indicated that Matthew was screaming in the shower due to the severe pain. All these incidents are also reflected on the video feeds incorporated into this complaint by reference.

53.     As further support for the fact that Matthew was so ill that he could not even remain clothed, records related to his autopsy at the Southwestern Institute of Forensic Sciences indicate that Matthew was received with no clothing at all. This is highly unusual, as virtually all autopsies have supporting records which indicate that a person incarcerated in a jail was received with some type of clothing, most typically jail-issued clothing.

C.     Liability of Wichita County and CorrHealth

1.     Introduction

54.     Plaintiffs set forth in this section additional facts and allegations supporting liability claims against the County and CorrHealth pursuant to *Monell v. Department of Social Services,* 436 U.S. 658 (1978) and/or other applicable law. It is Plaintiffs' intent to show that all facts asserted in this pleading relating to policies, practices, and customs of the County and CorrHealth support such liability claims, and not just facts and allegations set forth in this section. Such policies, practices, and customs alleged in this pleading, individually or working together, and whether supporting episodic acts and omission or conditions of confinement claims, were moving forces behind and caused the constitutional violations and damages (including death) referenced herein. These policies, practices, and customs are pled individually and alternatively. The County and CorrHealth knew, when the County incarcerated the decedent, that their personnel, policies, practices, and customs were such that they could or would not meet constitutional obligations to protect the decedent, including but not necessarily limited to through provision of medical care. Further, consistent action and inaction by numerous County or CorrHealth employees or agents, specifically with regard to the decedent, confirms the policies, practices, and customs alleged in this complaint. The County made decisions about policy and practice which it implemented through its commissioner's court, its sheriff, its jail administrator, or through such widespread practice and custom that such practice and custom became the policy of the County as it related to

its jail. CorrHealth likewise made decisions about policy and practice which it implemented through appropriate employees, decisionmakers, or policymakers, and in the alternative or in addition through partnership or joint action with the County. Regardless, the Fifth Circuit Court of Appeals has made it clear that Plaintiffs need not allege the identity of chief policymakers at the pleading stage.

55.     There were several policies, practices, and customs of the County and CorrHealth which were moving forces behind, caused, were producing causes of, or proximately caused the decedent's suffering and death, and other damages referenced in this pleading. The County and CorrHealth made deliberate decisions, acting in a deliberately indifferent (applied only to episodic acts, if any, but not to alleged conditions of confinement) or objectively unreasonable manner, when implementing or allowing such policies, practices, and customs to exist. Further, when the County and CorrHealth implemented or consciously allowed such policies, practices, and customs to exist, they knew with certainty that the result would be serious injury or illness, suffering, or death.

### 2.    CorrHealth's Agreement and Partnership with Wichita County

56.     The business of providing, or in some situations unfortunately not providing, healthcare and mental healthcare to prisoners in county jails throughout the United States is big business. There are untold millions of dollars to be made by private companies, such as CorrHealth, promising and contracting to provide such services. CorrHealth is no exception to the rule that such companies are in business to make significant profits.

57.     CorrHealth maintains a website in which it touts its services as a for-profit medical provider for jails in Texas, New Mexico, Colorado, and Wyoming. It indicates, as of September 25, 2023, it had 300 tenured correctional healthcare professionals who cared for nearly 10,000 people per day. It also advertised that it is proactive and assertive in mitigating its county-partners'

looming risks and liabilities. CorrHealth's website provides numerous testimonials by employees of various counties regarding its provision of services. The chief deputy of one Texas county wrote that he appreciated the lengths CorrHealth goes to in an effort to reduce Jefferson County's costs. Lisa Patterson, Captain of the Wichita County, Texas jail, wrote that the County transitioned from Wellpath to CorrHealth in both Wichita County detention facilities on March 1, 2022. Thus, CorrHealth became Wichita County jail's healthcare provider one month before Matthew's death.

58.     CorrHealth also advertises on its website statements made by a retired lieutenant of a detention center in another Texas county. He wrote that unnecessary medical-related transports to hospitals are labor and time-intensive, costly, and increase risks and liabilities. He further wrote that decreasing those transports was a prime focal point for that county when selecting its healthcare provider and that CorrHealth's leadership presented creative solutions to reduce those transports. He stated that, within 12 hours of the transition to CorrHealth, CorrHealth policies resulted in three people not being transported to a hospital who would have been transported to a hospital by the previous medical services provider. CorrHealth states on its website, "While we understand off-site transports will still be delivered to those requiring additional attention, we aim to limit these transports as much as possible." CorrHealth promises to save counties money.

59.     CorrHealth's website also references a number of relationships it has with or support it provides to various correctional-related entities, including the Texas Jail Association, Sheriffs' Association of Texas, Correctional Management Institute of Texas, Texas Association of Counties, East Texas Peace Officers Association, Colorado Jail Association, County Sheriffs of Colorado, Rocky Mountain Jail Leadership Academy, American Jail Association, National Sheriffs' Association, and Western State Sheriffs' Association. Upon information and belief, CorrHealth does so to market its for-profit services to law enforcement and jail personnel: it must

be viewed as a partner with jails. Its primary focus is thus keeping its clients, such as the County, satisfied by reducing client costs.. Interestingly, the Texas Association of Counties Intergovernmental Risk Pool provides coverage for claims for a substantial number of Texas counties for failure to provide medical care to jail detainees.

60.     CorrHealth also advertises: "CorrHealth's programs and services are designed to maximize on-site programs and services, reduce inmate movement and decrease costly, risk-laden, offsite medical-related transports." And, "CorrHealth partners with our counties to assist them in reducing overall costs and mitigate risk and liability. By reducing off-site transports and maximizing on-site services as well as by providing ongoing support and additional training for our qualified health care teams, [CorrHealth] ensure[s]that the goals of the county are a priority as part of our partnership." Explicitly and implicitly, CorrHealth signals its intent to reduce hospital transports. This resulted in Matthew's horrific suffering and death.

61.     Plaintiff's counsel was unable to obtain the inmate healthcare services agreement between the County and CorrHealth. However, upon information and belief, the agreement between the County and CorrHealth was substantially or materially the same as that between Jefferson County, Texas and CorrHealth commencing in April 2018. Upon information and belief, CorrHealth's written contracts with various counties across Texas contain substantially similar material terms. Plaintiffs reserve the right to amend this complaint after being able to conduct discovery and after Plaintiffs' review of all such relevant agreements to be produced, as required by the Federal Rules of Civil Procedure, with Defendants' initial disclosures. Thus, Plaintiffs' allegations referencing the agreement in this section of the complaint are all made upon information and belief.

62.     The agreement recognized that the County is charged by law with the responsibility of obtaining and providing reasonably necessary healthcare for detainees at the County jail. The agreement also further recognized that CorrHealth is in the business of providing correctional health services and desires to provide such services for the County pursuant to terms and conditions in the agreement. Further, the agreement indicated that the County contracted with CorrHealth to provide for delivery of medical, dental, and mental healthcare to detainees in County jails. The agreement indicated that CorrHealth's responsibility for medical care began when a person was booked into a County jail.

63.     CorrHealth's services included but were not limited to intake health screenings, regularly scheduled sick calls, nursing coverage, regular physician visits onsite, infirmary care, hospitalization, medical specialty services, emergency medical care, medical records management, pharmacy and pharmaceutical services, laboratory services, radiology services, auditory services, ophthalmology services, health education and training services, utilization review, a quality assurance program, administrative support services, dental services, and onsite emergency medical treatment for visitors or county personnel. However, the agreement contained an exception for providing elective medical care to detainees. "Elective medical care," for purposes of the agreement and partnership between the County and CorrHealth, means medical care which, if not provided, would not, in the opinion of CorrHealth's medical director, cause a detainee's health to deteriorate or cause definite harm to the detainee's wellbeing.

64.     The agreement further provided a stipulation regarding transporting services. Nonemergency and emergency transportation services, including reasonable security, were to be provided and paid for by the County. CorrHealth was responsible for requesting transportation in accordance with policies and procedures regarding transportation of detainees for medical reasons

mutually developed by CorrHealth and the County. Thus, the County and CorrHealth entered a partnership regarding policies, practices, and customs to be applied to detainees, such as the decedent in this case, regarding when or if at all to transport them to a local emergency department at an appropriate hospital.

65.    The agreement further provided that if the County became dissatisfied with any healthcare personnel provided by CorrHealth, CorrHealth would, following receipt of written notice from the County of the grounds for such dissatisfaction, exercise its best efforts to resolve the problem. If the County was not satisfied that such a problem had been resolved, the County could revoke that employee's right to enter County jails. Thus, the County retained some control over the right of CorrHealth employees to work in its jail. The agreement further provided that the decision to revoke a CorrHealth employee's right to enter a County jail would be at the sole discretion of the County. This furthered the partnership and agreement between the County and CorrHealth, regarding formulation and application of policies and procedures, related to medical care to be provided (or not provided) to County jail detainees.

66.    The agreement further provided that CorrHealth would engage certain healthcare professionals as independent contractors rather than employees. Plaintiff does not necessarily agree with such characterization. Parties who contract cannot simply designate certain persons as independent contractors if the law applicable to determination of whether a person is an independent contractor, and any factors applied according to the law, indicate otherwise. It is not uncommon for companies that are actually employers to designate employees as independent contractors to avoid paying taxes. Upon information and belief, CorrHealth personnel working in the County jail likely should have been characterized as employees and not independent contractors due to a number of factors, including supervision regarding the means and details of

the work, specified work hours, and further providing items, systems, or software with which personnel could engage in medical services in the jail. Regardless, the County reserved the right under the agreement to approve such medical professionals. The County further consented to the alleged subcontracting or delegation. The provision apparently was written to avoid potential government oversight, because the agreement indicated that the alleged independent contractor status of licensed healthcare professionals allegedly would prevent CorrHealth from being "considered or deemed to be engaged in the practice of medicine or other professions practiced by these professionals." Regardless, as to certain medical professionals, the agreement provided that CorrHealth would provide the County with evidence that CorrHealth had secured professional liability coverage of at least $2 million per incident, and $4 million in the aggregate.

67.    The agreement also required CorrHealth to cause, require, and maintain complete and accurate medical and mental health records for every detainee in the County jail who had received healthcare services from CorrHealth. Those records would be kept separate from detention records in accordance with applicable laws or TCJS requirements. The agreement recognized that such medical records belonged to the County, but that CorrHealth would be custodian of the records during the term of the agreement. Complete legible copies of such medical records would be available at all times to the County and might have been available to accompany each detainee transferred from the County jail to another location.

68.    The agreement also provided that, upon the County's request, CorrHealth was required to provide to the County, on a date and in a form mutually acceptable to the County and CorrHealth, monthly and annual reports relating to services provided under the agreement. Further, if the County requested, CorrHealth would submit monthly and other periodic reports to the County sheriff or detention administration at the jail regarding the overall health of detainees

committed to the custody of the County. Such reports would be submitted on a regular, periodic, or as-requested basis as determined by mutual written agreement between the County and CorrHealth. Further, reports were to be provided daily to the County sheriff, jail administration, or their designees regarding detainees in offsite, hospital care. Such reports were required to include those detainees' conditions, estimated duration of hospital stay, and approximate date of return, if at all, to the County jail. CorrHealth would further confirm the need for continued offsite care through such daily report.

69.     Upon information and belief, the purpose of such reporting was in part to enable the County to decide whether it would discharge a detainee from custody. Counties across Texas frequently, and likely daily, discharge detainees from custody when counties realize that their constitutional obligation to provide medical care may come at significant economic cost. In fact, it is most often the situation when a person, for example, suffers a significant brain injury or appears to be close to death, that Texas counties will discharge people like that from custody due to the likely significant hospital bill that will arise from continued inpatient care. The daily reporting is both direct and circumstantial evidence of the significant materiality and importance to both the County and CorrHealth of saving money by not transporting people, such as the decedent, to a local hospital. Upon information and belief, there was a culture and practice to discourage transporting detainees to a hospital due to the significant likelihood of the medical bills that would result.

70.     The agreement further provided that CorrHealth shall make available to the County, at the County's request, all records, documents, and other papers relating to direct delivery of healthcare services to detainees. This could occur during normal business hours and as often as the County deemed appropriate. The agreement also provided that the County would provide to

CorrHealth, at CorrHealth's request, the County's records related to provision of healthcare services to detainees.

71.     Plaintiffs are uncertain, and thus cannot allege upon information and belief, as to the exact amount of compensation being received by CorrHealth from the County. However, by way of example, in the Jefferson County agreement referenced in this complaint, CorrHealth was to be paid over $4 million annually, including $80,000 each week for the first quarter of services. Each monthly payment was to be paid by Jefferson County to CorrHealth before or on the last day of every month. Upon information and belief, the County paid CorrHealth millions of dollars to provide medical care to County jail detainees.

72.     The agreement further provided that CorrHealth would be financially responsible for costs associated with offsite treatments, hospitalization of detainees, medical specialty services, radiology services, and certain transportation services. The agreement further provided a maximum liability to CorrHealth for costs associated with the provision of offsite medical or other healthcare services, such cap being in the amount of $500,000 in the aggregate for each contractual year. Costs for any medical or other health services set forth in the contract which were to be provided to detainees during a contract year which exceeded this cap would be the responsibility of the County. Thus, the County and CorrHealth shared concern over provision of services that would lead to significant expense, such as those provided by an outside hospital.

73.     The agreement further contained an indemnity provision, whereby CorrHealth would indemnify, defend, and hold harmless the County and its elected officials, officers, agents, and employees, from claims, costs, attorney's fees, lawsuits, judgments, and/or liabilities suffered or incurred by CorrHealth resulting in any way from negligence, inadvertence, error, or omission

of CorrHealth or its agents or employees for failure to carry out responsibilities under the contract, including responsibilities imposed by state and federal law.

74.    The agreement further provided that CorrHealth would be an independent contractor and as such had sole responsibility for all diagnosis, treatment, and disbursement of all medication for medical, mental, and dental health. Further, the agreement provided that CorrHealth would have primary but not exclusive responsibility for identification, care, and treatment of detainees requiring medical care and who were security risks or presented a danger to themselves or others. Regardless of these contractual provisions, the County had a nondelegable duty to provide medical care to and protect detainees such as the decedent. Neither CorrHealth nor the County were able to contract away their constitutional duties and obligations.

### 3.    Nondelegable Duties and Respondeat Superior

75.    The County owed nondelegable constitutional duties to the decedent. Therefore, the County is liable for the policies, practices, and customs of CorrHealth, as well as the actions and inactions of CorrHealth employees that caused, were proximate causes of, or were producing causes of damages (including death) referenced in this pleading.

76.    Moreover, CorrHealth, in addition to liability for its policies, practices, and customs resulting in damages (including death) referenced in this pleading, is also vicariously liable, pursuant to respondeat superior, for the actions or inactions of its employees and agents. Plaintiffs make this allegation pursuant to existing law or as a good faith argument for the extension or confirmation of existing law. CorrHealth, as a large, private, for-profit entity, does not receive the same protection and is not, in the alternative, analyzed the same way as a liable entity as would be a county or other governmental body. Moreover, as to CorrHealth employees and agents, due to CorrHealth's status as a large, for-profit corporation, and controlling Fifth Circuit authority, they are not entitled to claim qualified immunity. No CorrHealth employees are Defendants in this case,

and Plaintiffs currently have no intent to add any natural persons as Defendants to this case.

Further, upon information and belief:

- CorrHealth was systematically organized to perform the major administrative task of providing medical and mental healthcare in jails inside and outside Texas.

- CorrHealth was at the time of incidents relevant to this case in the business of administering correctional healthcare services.

- CorrHealth has made millions of dollars each year from its contracts with Texas and other jails.

- CorrHealth was at the time of decedent's death a systematically organized entity with limited direct supervision by the County, undertaking its task for profit and while in competition with other for-profit firms providing similar services.

- Market forces existed at all relevant times that were likely to provide CorrHealth with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or nonarduous employee job performance.

- Ordinary marketplace pressures were present at all relevant times regarding CorrHealth's provision of services to the County.

- CorrHealth may have had, upon information and belief, a multi-year contract with the County with renewal periods, so that its performance was disciplined by pressure from potentially competing firms that could try to take its place in providing services to the County.

- CorrHealth was required by its contract to purchase substantial insurance coverage to compensate victims of civil rights torts. CorrHealth provided professional/medical malpractice liability coverage in an amount of not less than $2,000,000 per occurrence and $4,000,000 in the aggregate.

- CorrHealth, upon information and belief, maintained a risk management and legal defense team ready to aggressively address each claim or lawsuit against it.

- CorrHealth employed medical professionals who faced potential liability both for choosing a course of treatment that was too aggressive and for choosing a course not aggressive enough, rather than employing jailers who rarely face liability for the adequacy of provided medical care.

- CorrHealth's primary function at the jail was providing healthcare and mental healthcare services.

- CorrHealth employees are overseen by CorrHealth.

- CorrHealth, as opposed to the County, upon information and belief, took the lead in developing relevant policy regarding healthcare and mental healthcare provision in the the the County jail.

- CorrHealth developed and maintained, upon information and belief, the County jail's healthcare policies and procedures manual.

- The County could not, upon information and belief, fire or discipline CorrHealth's employees.

- CorrHealth employees had discretion to take certain actions which County employees lacked the authority to do.

- CorrHealth employees did not have a broad range of duties other than providing healthcare and/or mental healthcare.

- CorrHealth had substantial latitude to ensure that its employees were adequately motivated (such as through employer indemnification, increased benefits, and higher pay).

- CorrHealth's employees were "at will" employees and could be discharged at any time without cause.

- CorrHealth determined its employees' wages, conditions of employment, and availability of benefits.

- CorrHealth marketed its ability, upon information and belief, to attract qualified people to public service as an aspect of its sales pitch to the County and other governmental clients.

- CorrHealth, and likely its employees, knew that they could be subject to liability without the benefit of qualified immunity. Even so, CorrHealth was able to attract qualified employees.

- CorrHealth contracted to indemnify the County for liability caused by CorrHealth or its agents, employees, or contractors.

4.    Wichita County and CorrHealth Policies, Practices, and Customs

77.    Plaintiffs list beneath this heading County and CorrHealth policies, practices, and customs which Plaintiffs allege, upon information and belief, caused, proximately caused, were producing causes of, or were moving forces behind all damages referenced in this pleading, including the decedent's death. Thus, the County and CorrHealth are liable for all such damages. These policies, practices, and customs worked individually, or in the alternative together, to cause the decedent's death and all other damages asserted in this pleading. Plaintiffs plead conditions of confinement claims arising from policies, practices, and customs. Deliberate indifference is not an element of conditions of confinement claims. In the alternative, Plaintiffs plead episodic act or omission claims arising from policies, practices, and customs. Plaintiffs plead, to the extent necessary, that deliberate indifference underlying episodic act or omission claims, upon information and belief, occurred with regard to relevant actors. Regardless, Plaintiffs ask that the court apply the correct law to the facts pled, as required by United States Supreme Court precedent.

78.    One or more courts have recognized that it is exceedingly rare for a Plaintiff to have access to or personal knowledge of specific details regarding the existence or absence of a defendant's internal policies or training procedures before discovery. Thus, at the pleading stage, a plaintiff is merely required to put a governmental entity or private corporation on fair notice of the grounds for which it is being sued. Federal courts must rely on summary judgment to weed out unmeritorious claims. Plaintiffs thus plead the following policies, practices, and customs, which give rise to conditions of confinement claims, or in the alternative episodic act or omission claims:

**Failing to Provide Emergency or Necessary Medical Care**

- Wichita County or CorrHealth or both failed to provide or delayed providing medical treatment to detainees.

- Wichita County or CorrHealth or both, while knowing that detainees needed immediate emergency medical care, would continue incarcerating such detainees in lieu of obtaining needed care.

- Wichita County or CorrHealth or bothfailed to act to address observed serious health issues while monitoring detainees. This was in part an effort to save costs.

- Wichita County or CorrHealth or both employees would not respond, or respond appropriately, when detainees suffered from serious medical or mental health issues that were visible and apparent through the video feed of a detainee's cell. In the alternative, Wichita County or CorrHealth or both ignored video feeds even for detainees with serious medical or mental health issues.

- CorrHealth would not respond to a detainee's cell for an evaluation and subsequent emergency medical treatment, if determined to be necessary, when a jailer called for a medical emergency.

- Wichita County or CorrHealth or both would try to save Wichita County or CorrHealth money, by failing or refusing to transport detainees who vitally needed emergency medical care to a local emergency room.

- Wichita County and CorrHealth would only contact emergency medical services or transport a person to a local hospital if the person appeared to be near death or had become nonresponsive.

- Upon information and belief, CorrHealth incentivized its employees or alleged independent contractors through payment of bonuses or provision of other benefits for saving expenditures on medical or mental health services by limiting transports of jail detainees to local hospitals, among other things.

- Upon information and belief, Wichita County or CorrHealth or both treated detainees without apparent health insurance differently than those with it. Upon information and belief, CorrHealth personnel participated in and medically cleared Matthew for incarceration in the County jail on March 28, 2022. As part of the process, Matthew signed a form document for Texas Health and Human Services entitled "Application for Health Care Assistance" which indicated that Matthew had no money in his commissary or jail account and that Matthew had not worked in the three prior months. Upon information and belief, this was a form whereby Matthew could potentially obtain governmental assistance for healthcare he needed while incarcerated in the jail. Thus, Defendants were aware that Matthew apparently had no health insurance that would cover any treatment he received, including needed medical treatment at a local hospital.

**Monitoring**

- Wichita County or CorrHealth or both failed to monitor detainees or in the alternative failed to adequately or effectively monitor detainees.

**Communication**

- Upon information and belief, Wichita County or CorrHealth or both may not have appropriately communicated a detainee's serious medical needs from one shift to another through appropriate pass down notes,logs, or meetings. In this case, the decedent's issues were obvious near the end of one shift and continued through hours of suffering and death during another shift.

**Training**

- Wichita County used jailers who did not have permanent jailer licenses, but instead only temporary jailer licenses. Georgeana Latham, for example, began working at the Wichita County Sheriff's Office under a temporary jailer license on or about September 10, 2021. She did not obtain a permanent jailer license until August 30, 2022. This reflected a policy, practice, or custom of failing to train jailers before they interacted with detainees. A temporary jailer license does not require any jail-related education, training, or experience. A person could, for example, be working one day at the person's first and only job, at a fast-food restaurant, and then the next day begin working at a jail in which they are confronted with detainees with serious medical and mental health issues. Plaintiffs expect that they may find through discovery that other jailers who came in contact with Matthew likewise operated under only temporary jailer licenses without any education, training, or experience.

**Other Evidence of Policies, Practices, and Customs**

- Dishonesty and apparent cover up are evidence supporting a finding of unconsitutional policies, practices, and customs. Wichita County or CorrHealth or both allowed or sanctioned false observation or other relevant logs regarding detainees. Logs for detainee checks in the County jail relating to Matthew during the final hours and days of his life indicate, as both direct and circumstantial evidence, that the County gave short shrift to its duties to appropriately protect detainees through, in part, making appropriate observations. These records contain false entries. For example, a housing unit security check log for April 1, 2022, contains a number of entries regarding Matthew beginning early in the morning, "Well-being check inmate and cell okay (MED 105)." Matthew was clearly not well, and everyone knew it. Regardless, the same formulaic entry was provided repeatedly in the log. These entries even continued after Matthew died or

was near death, with such "well-being" checks recorded as occuring at
12:20 p.m., 12:40 p.m., 1:10 p.m., 1:17 p.m., 1:40 p.m., and 1:59 p.m. These
entries were clearly false. Further, the inmate meal log for Matthew
contained a false entry. An entry indicated that Matthew accepted his lunch
meal on April 1, 2022, at nearly 11:45 p.m. It never happened.

- When a policymaker knows about misconduct and fails to take remedial
  action, such inaction can support a finding that the policymaker acquiesced
  in the misconduct representing official policy, practice, or custom. Wichita
  County or CorrHealth or both failed to reprimand or take remedial action
  against employees or agents as a result of action or inaction related to
  Matthew's suffering and death, thus confirming that the policies, practices,
  and customs that led to Matthew's suffering and death were in fact *de facto*
  policies of Wichita County and CorrHealth.

- Consistent testimony or behavior of jail or CorrHealth employees can also
  support a finding of official policy, practice, or custom. Wichita County or
  CorrHealth or both employees acted consistently in their actions or inaction
  related to Matthew's suffering and death, thus confirming that the policies,
  practices, and customs that led to Matthew's suffering and death were in
  fact *de facto* policies of Wichita County and CorrHealth.

### 5.    TCJS Records Demonstrating County Policies, Practices and Customs

79.    TCJS reports regarding other incidents or areas of noncompliance with TCJS

standards can show policies, practices, and customs. Since it is exceedingly rare for a plaintiff to

have access to or personal knowledge of specific details regarding the existence or absence of a

defendant's internal policies or training procedures before discovery, a plaintiff is not required to

allege at the pleading stage the level of detail that would be required to prove their claims at trial

or in response to a motion for summary judgment. That standard applies equally to TCJS reports

regarding which Plaintiffs may obtain more information through discovery. Plaintiffs are only

required to allege enough detail to provide sufficient fair notice of the general nature and substance

of Plaintiffs' allegations and further demonstrate that Plaintiffs' claims have facial plausibility.

TCJS reports and documents regarding County jail inspections further demonstrate the above

enumerated and other policies, practices, and customs that, when applied individually or working

together, caused, were proximate causes of, producing causes of, or were moving forces behind damages (including death) asserted in this pleading. TCJS reports can show not only specific policies, practices, and customs but also can point to a pervasive carelessness for or deliberate indifference to the needs of detainees.

80.    TCJS inspected the Wichita County jail from March 23 through 25, 2010, and notified Wichita County that deficiencies existed. TCJS urged Wichita County to give areas of noncompliance its serious and immediate consideration and to promptly initiate and complete appropriate corrective measures. TCJS notified Wichita County that its failure to do so following receipt of a TCJS notice of noncompliance could result in issuance of a remedial order. The Wichita County sheriff and, upon information and belief, the county judge and one or more county commissioners, received written notice of the inspection and result. Moreover, upon information and belief, such receipt or notice occurred as to all TCJS inspections and results referenced in this complaint.

81.    After reviewing quarterly training logs, TCJS inspectors determined that jail staff were not receiving quarterly training for emergency situations. TCJS standards required training of staff for emergency situations immediately upon employment and no less than each calendar quarter for all jail personnel.  TCJS also cited the County regarding its obligation to appropriately observe detainees. Documentation revealed that observation of detainees in holding and detoxification cells exceeded the maximum 30-minute interval. Additionally, after reviewing documentation for visual face-to-face detainee observations, TCJS inspectors determined that observation times exceeded 30 minutes for all detainees who were known to be assaultive, potentially suicidal, or mentally ill, or who had demonstrated bizarre behavior. Further, after reviewing inmate medical records, TCJS staff determined that medical staff in the jail were not

following physicians' instructions. Detainees were not receiving medication as directed by physicians. TCJS inspectors also determined that the approved mental disability/suicide prevention screening instrument was not being fully completed for all newly admitted detainees as required.

82.    TCJS inspected the County jail from June 24 through 26, 2013. Inspectors had to provide technical assistance, specifically instructing the County to ensure that medical staff complete all medical information in detainees' medical files. Inspectors also determined that an overabundance of necessary filing had not been done at the Sprague Annex. Further, while reviewing a random selection of inmate medical files, TCJS inspectors determined that various files did not have the required intake screening form or the Continuity of Care Query (CCQ) form. A CCQ asks whether a person has previously received inpatient mental healthcare. Inspectors also noted that a magistrate was not being notified as required when there were indicators on the intake screening form,.

83.    TCJS inspected the County jail again from June 30 through July 1, 2014, and once again provided technical assistance. Inspectors required the County to ensure that, when medical staff were completing an intake screening form, and a detainee answered questions that indicated that he or she had a mental illness, medical staff must check "yes" to the question as to whether the screener suspected mental illness/mental retardation. Medical staff were only answering "yes" and notifying a magistrate unless a detainees showed signs of "mental retardation." After discussion with a captain in the jail, it was decided that a lieutenant would pull all inmate medical files and review all intake screening forms to attempt to remedy the situation.

84.    TCJS inspected the County jail from May 19 through 21, 2015. Once again, the County was in noncompliance. TCJS thus again notified the County to give areas of

noncompliance its serious and immediate consideration and to promptly initiate complete and appropriate corrective measures. TCJS reminded the County that, if it failed to initiate and complete corrective measures, following notice of noncompliance, TCJS could initiate a remedial order.

85.    After reviewing quarterly training documentation, TCJS determined that not all jailers were receiving self-contained breathing apparatus training as required by minimum standards. Further, when walking through the jail, TCJS inspectors noted a lot of graffiti from where inmates had drawn on cell walls, and that there was abundance of trash on cell floors including rotten food. Inspectors, after reviewing documentation for the annual health inspection, found that violations had been noted but not addressed. This inspection had occurred over a month before, on April 3, 2015. Inspectors also noted a long list of facility and preventive maintenance issues.

86.    TCJS inspected the County jail from May 12 through 13, 2020. The inspector had to provide technical assistance after reviewing health service documentation. The inspector determined that on occasion the jail's mental disability/suicide prevention screening instrument was not being completed in its entirety. Missing fields included times, explanations as to "yes" answers, and notifications. The inspector noted that medical services in the jail were provided pursuant to a contract with the County, and that administration was notified of the issue. The inspector required jail administration to promptly develop a plan of action to update training of all medical staff who conducted mental disability/suicide prevention screening and to provide the inspector a roster verifying that such training took place. The inspector also noted the continuing problem of jail sanitation, noting that sanitation issues existed in multiple single occupancy cells at the annex location. There was trash buildup, food containers, and fruit flies in multiple single

occupancy cells at the time of inspection. Jail administration was required to send a follow up email to the inspector detailing plans to remedy the problem.

87.    TCJS inspected the jail again from May 24 through 25, 2021. When inspecting the downtown facility, the inspector found that medical waste, including full sharps containers and biohazard bags filled with medical waste, were being stored in a cell. The area in which such storage occurred was considered inmate housing and not a proper medical waste storage area. Jail administration had to develop a plan of action to ensure that medical waste was properly stored and disposed of in a timely manner. The plan of action had to be scanned and emailed to the inspector within 30 days.

88.    When walking through the downtown facility, the inspector also found a five gallon bucket filled with concrete. An eye bolt was embedded in the concrete and had leg irons attached to it. Jail administration referred to it as a "mobile restraint device." They further indicated that it was to "restrain unruly inmates during GED class, interviews or other programs that may take place." The inspector notified jail administration that such a device could be considered inhumane and could moreover possibly exacerbate physical infirmities.

89.    The TCJS inspected the jail on August 10, 2022, and found the jail to be noncompliant. Once again, the County was urged to give areas of noncompliance its serious and immediate consideration and to promptly initiate and complete appropriate corrective measures. The County was again warned that its failure to initiate and complete corrective measures after its receipt of a notice of noncompliance could result in issuance of a remedial order. A document associated with that failure was signed by the sheriff and the jail administrator, and indicated that Judge Woody Gossom was briefed by phone. This obviously occurred after Matthew's death and thus confirmed preexisting policies, practices, and customs.

90.     When reviewing restraint logs, the inspector noted that observation checks were conducted outside the required 15-minute timeframe by as little as one minute to as much as nine minutes on multiple occasions. The inspector notified jail administration that such observation checks had to be conducted in accordance with minimum jail standards. The inspector required jail administration to conduct documented training with jail staff on the use of restraints and requirements outlined in minimum standards within the next 30 days. It is vitally important, from a medical perspective, that such observations be made. Otherwise, serious injury or death could occur. This was yet another example of the County's and CorrHealth's failure to properly observe and treat detainees.

91.     Further, when reviewing detainee medical files, the inspector found that jail staff, on multiple occasions, failed to complete the Screening Form for Suicide and Medical/Mental/Developmental Impairments in its entirety. The inspector found missing information including the time the form was completed, comments for affirmative answers, and CCQ return information. The inspector also found that the approved tuberculosis plan for the jail had expired the previous month. The inspector required jail administration to conduct documented training within 30 days with staff on completing the screening form for suicide and medical/mental/developmental impairments in its entirety.

<u>6.     Suffering and Death of Other Detainees</u>

92.     Other incidents of suffering and death in the County jail can show policies, practices, and customs. Since it is exceedingly rare for a plaintiff to have access to or personal knowledge of specific details regarding the existence or absence of a defendant's internal policies or training procedures before discovery, a plaintiff is not required to allege at the pleading stage the level of detail that would be required to prove their claims at trial or in response to a motion

for summary judgment. Discovery can weed out incidents that are not sufficiently related to the incident in this case to show policies, practices, and customs, but at the pleading stage, Plaintiffs are only required to allege enough detail to provide sufficient fair notice of the general nature and substance of Plaintiffs' allegations and further demonstrate that Plaintiffs' claims have facial plausibility. Other incidents of suffering and death further demonstrate the above enumerated and other policies, practices, and customs that, when applied individually or working together, caused, were proximate causes of, producing causes of, or were moving forces behind damages (including death) asserted in this pleading. Other incidents can show not only specific policies, practices, and customs but also can point to a pervasive carelessness for or deliberate indifference to the needs of detainees.

93.    On November 10, 2014, Brandon Walker was observed experiencing a medical emergency in his cell and was taken to the medical unit of the jail. He appeared to go into cardiac arrest and was taken to the hospital via ambulance, where he was pronounced deceased due to occlusive coronary atherosclerosis.

94.    On May 4, 2015, Ronnie Hutson was booked into the Wichita County jail and reported no "unusual conditions." However, Mr. Hutson was observed sweating profusely and seizing after being placed in the main holding area. He admitted to ingesting methamphetamine, and an ambulance was called, but he was later pronounced deceased at the emergency room.

95.    On February 14, 2017, Quantrell Hutchinson suffered injuries after an altercation with officers due to his trying to escape the jail. Pepper spray, a pepper ball launcher, and a taser were all used on Mr. Hutchinson, and he shortly after became unresponsive. He was taken to the hospital and placed on life support until February 24, 2017, when he was pronounced deceased

due to "acute diffuse ischemic encephalopathy following cardiac arrest due to effects of cocaine use, psychiatric illness, and physiologic stress of physical altercation."

96.     On September 2, 2018, a welfare check was called for Joe Johnson after he had not moved in approximately four hours. He was taken to the hospital, where medical staff discovered a brain bleed and promptly performed an operation to alleviate the pressure. Mr. Johnson remained on a ventilator until September 6, 2018, when he was pronounced deceased.

97.     On January 30, 2019, Bernard Grant was found unresponsive by the housing officer while delivering meal trays. Life-saving measures were performed until Mr. Grant could be transferred to the hospital, where he was pronounced deceased. His death was deemed "accidental," although it is noted that Mr. Grant was experiencing medical problems on entry to the jail.

98.     On September 13, 2021, Cedric Hardesty was found unresponsive without a pulse in his housing unit. He was transported to the hospital, but was pronounced deceased by a medical provider at the hospital. Mr. Hardesty's cause of death was determined to be as a result of Covid-19 infection, and it is noted that he exhibited medical problems on entry to the jail on April 17, 2021.

99.     On September 15, 2021, Leo Lawrence was observed to be breathing heavily and was verbally unresponsive. Medical staff entered and began life-saving measures, but Mr. Lawrence was ultimately pronounced deceased on arrival at the hospital. His cause of death was later attributed to Covid-19.

100.     On October 28, 2022, Lawrence McKinzie suffered a medical emergency in his pod, where he was unable to stand and became unresponsive soon after staff entered to assist him. Medical staff attempted CPR and to use an AED, though the AED never administered any shocks.

Mr. McKinzie never regained consciousness and was pronounced deceased after being transported to the emergency room.

III.     Causes of Action

    A.     Fourteenth Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson*

101.     In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), a pretrial detainee sued several jail officers alleging that they violated the Fourteenth Amendment's Due Process Clause by using excessive force against him. *Id*. at 2470. The Court determined the following issue: "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable." *Id.* (emphasis in original). The Court concluded that the objectively unreasonable standard was that to be used in excessive force cases and that an officer's subjective awareness was irrelevant. *Id.* The Court did so, acknowledging and resolving disagreement among the Circuits. *Id.* at 2471-72. The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 2472. Instead, "courts must use an objective standard." *Id* at 2472-73. "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 2473. Thus, the Court required no *mens rea*, no conscious constitutional violation, and no subjective belief or understanding of offending police officers, or jailers, for an episodic claim but instead instructed all federal courts to analyze officers', or jailers', conduct on an objective reasonability standard. Since pretrial detainees' rights to receive reasonable medical and mental healthcare, to be protected from harm, and not to be punished at all, also arise under the Fourteenth Amendment's Due Process Clause, there is no reason to apply a different standard when analyzing those rights.

102.    Thus, the trail leads to only one place – an objective unreasonableness standard, with no regard for any natural person's subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the Fourteenth Amendment. The Fifth Circuit, and this Court, should reassess Fifth Circuit law in light of *Kingsley* and apply an objective unreasonableness standard to appropriate constitutional claims in this case. The court should not apply a subjective state of mind or deliberate indifference standard. The Supreme Court discarded the idea that a pretrial detainee should have such a burden.

103.    This *Kingsley* section potentially applies, depending on the status of the law at application, only to any claims that ultimately might ever be asserted against natural persons, or any episodic act or omissions claims against Wichita County or CorrHealth. Plaintiffs make no allegation or stipulation that deliberate indifference would necessarily be a requirement in such a situation. Regardless, deliberate indifference is not a requirement to show conditions of confinement claims against Wichita County or CorrHealth. Further, Plaintiffs currently have no intent to seek to add any natural persons as defendants to this case.

B.    Remedies for Violation of Constitutional Rights

104.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983. Therefore, Plaintiffs seek, for causes of action asserted in this complaint, all remedies and damages available pursuant to Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related or supporting case law. If the decedent had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action for violation of the United States Constitution and obtain

remedies and damages provided by Texas and federal law. Plaintiffs incorporate this remedies section into all sections in this complaint asserting causes of action.

### C.    Cause of Action Against Wichita County and CorrHealth Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

105.    In the alternative, without waiving any other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendants Wichita County and CorrHealth are liable to Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs, pursuant to 42 U.S.C. § 1983, for violating the decedent's constitutional rights including but not necessarily limited to those to receive reasonable medical/mental healthcare, to be protected, and not to be punished as a pretrial detainee. These rights are guaranteed by at least the Fourteenth Amendment to the United States Constitution. Pretrial detainees are entitled to be protected and not to be punished at all, since they have not been convicted of any alleged crime resulting in their incarceration. Regardless, Plaintiffs rely on the Court to apply the correct constitutional guarantees to the facts pled as required by United States Supreme Court precedent.

106.    The County's and CorrHealth's employees and agents acted or failed to act under color of state law at all relevant times. The County's and CorrHealth's policies, practices, and customs were moving forces behind and caused, were producing causes of, or were proximate causes of the decedent's suffering, damages, and death, and all damages suffered by Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs.

107.    The Fifth Circuit Court of Appeals has made it clear that Plaintiffs need not allege the appropriate chief policymaker at the pleadings stage. Nevertheless, out of an abundance of caution, the County sheriff was the County's relevant chief policymaker over matters at issue in

this case. Moreover, in addition, and in the alternative, the County's jail administrator was the relevant chief policymaker over matters at issue in this case. Finally, in addition, and in the alternative, the County's commissioners' court was the relevant chief policymaker. Further, out of an abundance of caution, CorrHealth's relevant chief policymaker over matters at issue in this case was or were its chief operating officer, president, vice president, physician-in-charge, chief nursing officer, or someone in a similar position.

108.     The County and CorrHealth were deliberately indifferent regarding policies, practices, and customs developed or used with regard to issues addressed by allegations set forth above, for any facts which are ultimately determined to support episodic act or omission claims, to the extent deliberate indifference is a necessary element or prerequisite to such claims at the time the Court makes that determination. Deliberate indifference is not an element of a conditions of confinement claim. The County and CorrHealth also acted in an objectively unreasonable manner. Policies, practices, and customs referenced above, as well as the failure to adopt appropriate policies, were moving forces behind and caused violation of the decedent's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur. Once again, by including the "deliberate indifference" allegation, Plaintiffs are not conceding or alleging that deliberate indifference is a necessary element of a conditions of confinement claim. It is not. The County's and CorrHealth's relevant policies, practices, and customs, whether written or not, were also objectively unreasonable as applied to the decedent.

109.     Therefore, the decedent's estate and his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery, through the estate administrator, from the County and CorrHealth:

- the decedent's conscious physical pain, suffering, and mental anguish;

- the decedent's loss of life and/or loss of enjoyment of life;

- the decedent's medical expenses; and

- the decedent's funeral expenses.

110.   Donna Fox, individually, and Ms. Hovis, as estate administrator asserting claims on behalf of Wrongful Death Beneficiaries, also seek recovery from the County and CorrHealth for all remedies and damages available to each Wrongful Death Beneficiary individually for claims asserted in this pleading. Ms. Fox seeks such damages as a result of the wrongful death of her son, and Mr. Maxwell's minor child or children, referenced above, are entitled to such damages as a result of the wrongful death of their father. The County's and CorrHealth's policies, practices, and customs caused, were proximate or producing causes of, or were moving forces behind and caused the following damages suffered by these people, for which each individually seeks compensation, whether as a party to this case or through another party asserting claims for such relief in some representative or other legally-appropriate capacity:

- past mental anguish and emotional distress suffered by each resulting from and caused by the decedent's death;

- future mental anguish and emotional distress suffered by each resulting from and caused by the decedent's death; and

- loss of companionship and society, as applicable, that each would have received from the decedent.

Moreover, Plaintiffs seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

## IV.     Concluding Allegations and Prayer

### A.     Conditions Precedent

111.   All conditions precedent to assertion of all claims herein have occurred.

B.    Use of Documents at Trial or Pretrial Proceedings

112.    Plaintiffs intend to use at one or more pretrial proceedings and at trial all documents produced by Defendants in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).

C.    Jury Demand

113.    Plaintiffs demand a jury trial on all issues which may be tried to a jury.

D.    Prayer

114.    For these reasons, Plaintiffs ask that Defendants be cited to appear and answer, and that Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs have judgment for damages within the jurisdictional limits of the court and against Defendants, jointly and severally, as legally available and applicable, for all damages referenced above and below in this pleading:

a)    actual damages and including but not necessarily limited to for:

- the decedent's medical expenses;

- the decedent's funeral expenses;

- past mental anguish and emotional distress suffered by each Wrongful Death Beneficiary resulting from and caused by the decedent's death;

- future mental anguish and emotional distress suffered by each Wrongful Death Beneficiary resulting from and caused by the decedent's death;

- loss of companionship and/or society, as appropriate, with the decedent suffered by each Wrongful Death Beneficiary resulting from and caused by the decedent's death;

- the decedent's conscious physical pain, suffering, and mental health anguish; and

- the decedent's loss of life and loss of enjoyment of life;

b)      reasonable and necessary attorneys' fees through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988;

c)      court costs and all other recoverable costs;

d)      prejudgment and postjudgment interest at the highest allowable rates; and

e)      all other relief, legal and equitable, general and special, to which Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs are entitled.

Respectfully submitted:

Law Offices of Dean Malone, P.C.

   /s/ T. Dean Malone
T. Dean Malone

T. Dean Malone
Attorney-in-charge
dean@deanmalone.com
Texas State Bar No. 24003265
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:  (214) 670-9989
Telefax:    (214) 670-9904

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
michael.oconnor@deanmalone.com
Jennifer Kingaard
Texas State Bar No. 24048593
jennifer.kingaard@gmail.com
Alexandra W. Payne
Texas State Bar No. 24118939
alexandra.payne@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:     (214) 670-9989
Telefax:       (214) 670-9904

Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 18, 2023, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court, and the electronic case filing system sent a notice of electronic filing to all attorneys of record.

/s/ T. Dean Malone
T. Dean Malone