IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TIFFANY HOVIS, as dependent administrator of and on behalf of the ESTATE OF MATTHEW RAY MAXWELL, and MATTHEW RAY MAXWELL's heir(s)-at-law and wrongful death beneficiaries; and DONNA DIAZ, individually, | § § § § § § § § | |
| Plaintiffs, | § § | |
| V. | § § | No. 3:23-cv-2220-L |
| WICHITA COUNTY, TEXAS; and CORRHEALTH PLLCC A/K/A CORRHEALTH, | § § § § | |
| Defendants. | § § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Following the death of Matthew Ray Maxwell while a pretrial detainee at the Wichita County, Texas jail, Plaintiffs filed this lawsuit asserting that Maxwell's constitutional rights were violated.

Defendant Wichita County, Texas moved to dismiss the claims against it in Plaintiffs' First Amended Complaint [Dkt. No. 19] under Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. No. 27.

United States District Judge Sam A. Lindsay referred the motion to the undersigned United States magistrate judge for hearing, if necessary, and for recommendation under 28 U.S.C. § 636(b). *See* Dkt. No. 29.

Plaintiffs responded to the motion. *See* Dkt. No. 35. And the County filed a

reply brief. *See* Dkt. No. 39.

The undersigned now enters these findings of fact, conclusions of law, and recommendation that the Court should deny the motion to dismiss.

## Legal Standards

In deciding a motion to dismiss for failure to state a claim on which relief may be granted under Rule 12(b)(6), the Court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205-06 (5th Cir. 2007). Even so, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and must plead those facts with enough specificity "to raise a right to relief above the speculative level," *id.* at 555.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). *Cf. Bryant v. Ditech Fin., L.L.C.*, No. 23-10416, 2024 WL 890122, at *3 (5th Cir. Mar. 1, 2024) ("[J]ust as plaintiffs cannot state a claim using speculation, defendants cannot defeat plausible inferences using speculation.").

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. So, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (cleaned up; quoting *Twombly*, 550 U.S. at 557); *see, e.g.,*

*Parker v. Landry*, 935 F.3d 9, 17 (1st Cir. 2019) (Where "a complaint reveals random puffs of smoke but nothing resembling real signs of fire, the plausibility standard is not satisfied.").

And, while Federal Rule of Civil Procedure 8(a)(2) does not mandate detailed factual allegations, it does require that a plaintiff allege more than labels and conclusions. So, while a court must accept a plaintiff's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Consequently, a threadbare or formulaic recitation of the elements of a cause of action, supported by mere conclusory statements, will not suffice. *See id.*; *Armstrong v. Ashley*, 60 F.4th 262, 269 (5th Cir. 2023) ("[T]he court does not 'presume true a number of categories of statements, including legal conclusions; mere labels; threadbare recitals of the elements of a cause of action; conclusory statements; and naked assertions devoid of further factual enhancement.'" (quoting *Harmon v. City of Arlington, Tex.*, 16 F.4th 1159, 1162-63 (5th Cir. 2021))).

And, so, "to survive a motion to dismiss" under *Twombly* and *Iqbal*, plaintiffs must "plead facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" that they contend entitle them to relief. *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014) (per curiam) (citing Fed. R. Civ. P. 8(a)(2)-(3), (d)(1), (e)).

"Municipalities can be held liable for violating a person's constitutional rights under [42 U.S.C.] § 1983." *Sanchez v. Young Cnty., Tex.*, 956 F.3d 785, 791 (5th Cir.

2020) ("*Sanchez II*") (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)).

And the general pleading standards set out above apply to a claim against a municipality. *See Hutcheson v. Dall. Cnty., Tex.*, 994 F.3d 477, 482 (5th Cir. 2021) ("There is no heightened pleading standard for § 1983 claims against municipalities. To survive a motion to dismiss, the complaint need not contain detailed factual allegations but still must state sufficient facts to establish a plausible claim on its face." (citing *Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616, 622 (5th Cir. 2018))).

But, because "[a] person may sue a municipality that violates his or her constitutional rights [only] 'under color of any statute, ordinance, regulation, custom, or usage,'" *id.* (quoting Section 1983; citing *Monell*, 436 U.S. at 690), a plaintiff alleging a *Monell* claim "has two burdens: to [plausibly allege] (1) that a constitutional violation occurred and (2) that a municipal policy was the moving force behind the violation," *Sanchez II*, 956 F.3d at 791 (citing *Monell*, 436 U.S. at 694); *see also Cope v. Coleman Cnty.*, No. 23-10414, 2024 WL 3177781, at *3 (5th Cir. June 26, 2024) (per curiam) ("*Cope II*") ("A municipality may be held liable for a constitutional violation 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" (quoting *Monell*, 436 U.S. at 694)).

## Analysis

Although the undersigned has set out the familiar Rule 12(b)(6) standards above, it bears repeating that the motion the Court has referred for recommendation is one to dismiss Plaintiffs' amended complaint. Such a motion is "not meant to

resolve disputed facts or test the merits of a lawsuit" but "instead must show that, even in the plaintiff's best-case scenario, the complaint does not state a plausible case for relief." *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 581 (5th Cir. 2020). So, undertaking the analysis below, the undersigned remains "mindful of [the] obligation to accept [the amended] complaint's factual allegations as true and assess whether those facts permit a reasonable inference that the [County] is liable." *Id.*

Because the facts alleged do permit that inference, the undersigned recommends that the motion be denied for the reasons explained below.

As Plaintiffs allege, while detained pretrial at the Wichita County jail, following his arrest on March 28, 2022, Maxwell died on April 1, 2022 as a result of a bowel blockage that lasted at least six hours. *See* Dkt. No. 19, ¶¶ 9-11.

At the time of Maxwell's death, the "jail's healthcare provider" was Defendant CorrHealth, PLLC a/k/a CorrHealth, a "for-profit medical provider for jails in Texas" and other states. *Id.*, ¶ 57 ("Lisa Patterson, Captain of the Wichita County, Texas jail, wrote that the County transitioned from Wellpath to CorrHealth in both Wichita County detention facilities on March 1, 2022.").

CorrHealth medical records reflect that, at 6:15 a.m. on April 1, Maxwell reported to Bonnie Shavers, a CorrHealth employe, that his pain was as a 10 out of 10, and Shavers gave Maxwell milk of magnesia. *See id.*, ¶¶ 12 & 14.

The amended complaint next sets out a timeline of the alleged events from Maxwell's reporting his pain to Shavers to his death, later that day. For purposes of analyzing the motion to dismiss, the undersigned sets out the facts alleged but

eliminates some of the conclusions embedded in the allegations:

> At approximately 6:45 a.m., Wichita County Sheriff's Office Corporal J. Price received a call from detention officer Joshua Jackson (# 4667) in L-pod regarding Matthew. Officer Jackson said that Matthew was in pain and doubled over in the shower. Officer Jackson said that he called "Medical," which was upon information and belief CorrHealth, and told Medical that Matthew was having stomach pain. Instead of responding, Medical told Officer Jackson to "put a sick call in."
>
> Approximately three minutes later, Corporal Price arrived at L-pod and went to the shower to talk to Matthew. Matthew was in the shower screaming and doubled over in pain. Corporal Price told Matthew that he would contact Medical again. Corporal Price then went to the officer station to contact Medical, presumably CorrHealth.
>
> Corporal Price spoke with LVN Josh Simpkins. He told LVN Simpkins he knew that Officer Jackson had called about Matthew, but that he (Corporal Price) wanted Medical to come and assess Matthew due to him being doubled over in pain and screaming. Simpkins, upon information and belief a CorrHealth employee, spoke with someone else in Medical and allegedly said it was not an emergency. Simpkins said that a sick call was already in place for Matthew to see a doctor "in the morning." Corporal Price said he understood but felt that the situation had changed. Corporal Price also said [that he] would call a medical emergency to L-pod if someone was not going to do an assessment of Matthew....
>
> LVN Simpkins then spoke with someone else in Medical. LVN Samantha Hall then joined the phone call. LVN Hall said that they were told by their bosses, upon information and belief higher-level or management employees at CorrHealth, that jailers could not threaten to call a medical emergency and in doing so get a nurse to go to the pod. Corporal Price told them in substance, "Fine," and that he was going to get Matthew dressed and bring him down to Medical. Corporal Price then hung up the phone. Corporal Price realized Matthew's dire state and wanted someone to do something about it. When medical personnel failed or refused to do so, he decided to take action. Corporal Price took Matthew to Medical, which required some assistance for Matthew to be able to walk. Once in Medical, Detention Officer Caesar Cabrera (#4584) took over for Corporal Price. Corporal Price returned to the report room to conduct shift change. Upon information and belief, shift change occurred at 7:00 a.m. Matthew was moved to and held in medical segregation cell X-105 at some point, which is where he would suffer for several hours and die. Jailers and medical personnel could easily see into the cell, as there was a vertical window in the cell door and a large vertical window next to the cell door.

Matthew vomited up the milk of magnesia …. Detention officer Georgeana Latham (#4677) was working in the medical segregation unit at the jail on April 1, 2022. She related that, at approximately 7:40 a.m., Matthew was brought to medical segregation complaining of severe stomach pain. She noted that he had been given milk of magnesia but that he vomited it up shortly thereafter. Detention officer Kameron Young (#4454) was working the same shift as detention officer Latham. Detention officer Young confirmed that Matthew had been complaining of severe stomach pain. Officer Young[] also confirmed that, after administration of milk of magnesia, Matthew vomited it up.

Nicole Hooper indicates that, at approximately 8:10 a.m., she was asked to evaluate Matthew for abdominal cramping. Matthew was standing in his cell, naked. … Matthew was removing clothes, manipulating clothing, manipulating a blanket, and doing anything he could to try to dull or resolve the excruciating pain. According to one or more other witnesses, Matthew was becoming worse, not getting better. This was likely roughly one-and-a-half to two hours or so after he had been given milk of magnesia (which he vomited up) and had been found doubled over screaming in pain. Ms. Hooper saw feces smeared on the bed mat. Matthew's blood pressure was now dangerously high, at 180/110.

… Matthew had been screaming, doubled over in pain, and now his blood pressure was in an emergency treatment range. [U]pon information and belief to avoid expense which would be incurred by CorrHealth and/or County, blood pressure medication was administered. Matthew was also provided an enema and additional stomach medication. Detention officer Kameron Young indicated that, after giving Matthew the blood pressure medication and additional stomach medication, as he had done with the milk of magnesia, Matthew vomited up the medication. …

[T]he entry by Ms. Hooper was not made until 1:37 p.m., well after Matthew died. The entry should have been made shortly after the alleged occurrence at 8:10 a.m. that morning. The failure to do so violated all known medical and correctional medicine standards. The late entry also gives rise to an inference that it may have been drafted in a light most favorable to Defendants and in a manner not entirely candid.

… Matthew's blood pressure was 111/76 on March 28, 2022 at 2:44 p.m., and it was 130/66 at 6:15 a.m. on April 1, 2022. Matthew's blood pressure was thus typically normal. It increased after he began experiencing pain at a level of 10-out-of-10. According to medical records, by 7:25 a.m. on April 1, 2022, Matthew's blood pressure had increased to 188/120. Matthew was in such pain at the time, according to medical records, that medical personnel were unable to obtain his

heart rate due to Matthew being "too restless." …

Officer Latham and Officer Young confirmed, contrary to a meal log, that Matthew refused his lunch tray at roughly 11:44 a.m. and was still complaining about abdominal pain. Officer Latham called CorrHealth personnel at approximately noon to tell them that Matthew could not breathe and was coughing up blood.

Approximately six hours after Defendants became aware that Matthew was suffering with pain at a level of 10-out-of-10, doubled over, and screaming, Officer Latham finally called a medical emergency. This occurred at approximately 12:18 p.m., to the medical segregation cell in which Matthew was incarcerated. Matthew had shortness of breath, and medical personnel could see through the cell observation window that Matthew was vomiting clear liquid onto the floor. It was too late for Matthew, as he would be deceased in a matter of minutes. Before personnel entered Matthew's cell, Matthew slumped over and became unresponsive. CPR was started shortly thereafter, and Ms. Gallardo said, "Medical emergency, starting CPR, call 911 now." The AED device did not advise a shock. It was far too late for Matthew to receive medical treatment.

Another portion of CorrHealth's medical records, completed or entered at roughly 2:57 p.m. on April 1, 2022, regarding Matthew's death occurring between roughly 12:13 and 12:18 p.m., provided further evidence of Matthew's immediate death after roughly six hours of excruciating pain. After Matthew slumped over and lost consciousness, a nurse immediately checked for his pulse. The nurse found no blood pressure reading. Matthew had no pulse. Matthew had no respiration. Matthew was deceased.

Matthew died at the jail. Upon information and belief, jailers at the scene wanted to "call" the fact that Matthew was deceased at the jail but were not allowed to do so by one or more supervisors. Supervisors apparently wanted Matthew's death to be "called" at the hospital to attempt to avoid liability for his suffering and death. …

*Id.*, ¶¶ 15-27; *see also id.*, ¶¶ 28-40 (describing Maxwell's behavior in the medical segregation cell the hours that led up to his death as depicted on video recordings that Plaintiffs allege "one or more employees of Defendants were able to see … for the entire several-hour time period" and "could have taken action based on").

Further facts alleged in the complaint, pertaining to alleged conditions and policies, as well as other elements of liability, are incorporated below.

"The constitutional rights of a pretrial detainee are found in the procedural and substantive due process guarantees of the Fourteenth Amendment." *Ford v. Anderson Cnty., Tex.*, 102 F.4th 292, 307 (5th Cir. 2024) (per curiam) (quoting *Est. of Henson v. Wichita Cnty.*, 795 F.3d 456, 462 (5th Cir. 2015)).

These rights "include the right to medical care." *Sanchez II*, 956 F.3d at 791 (citing *Sanchez v. Young Cnty.*, 866 F.3d 274, 279 (5th Cir. 2017) (per curiam) ("*Sanchez I*")).

And the United States Court of Appeals for the Fifth Circuit "characterizes such § 1983 violations of a pretrial detainee's rights as either episodic-acts-or-omissions claims or conditions-of-confinement claims." *Id.* (citing *Hare v. City of Corinth*, 74 F.3d 633, 644 (5th Cir. 1996) (en banc)).

"When determining the appropriate standard for analyzing an alleged violation of a pretrial detainee's constitutional rights, '[a court] must first classify the challenge as an attack on a "condition of confinement" or as an "episodic act or omission."'" *Cope II*, 2024 WL 3177781, at *5 (quoting *Flores v. Cnty. of Hardeman*, 124 F.3d 736, 738 (5th Cir. 1997)). *Cf. Martinez v. City of N. Richland Hills*, 846 F. App'x 238, 247 (5th Cir. 2021) (per curiam) ("Because Martinez fails to provide non-conclusory allegations or allege facts to support the second and third elements of her *Monell* claims under either an episodic acts or conditions of confinement theory, her *Monell* claims are dismissed.").

And "courts determine which theory applies based on an assessment of the facts alleged." *Cope II*, 2024 WL 3177781, at *8 (citing *Olabisiomotosho v. City of*

*Hous.*, 185 F.3d 521, 526 (5th Cir. 1999); *Sanchez I*, 866 F.3d at 279 & n.3; footnote

omitted).

Starting with the general *Monell* framework, a plaintiff may proceed on a

Section 1983 claim against a municipality only by "identify[ing] '(1) an official policy

(or custom), of which (2) a policy maker can be charged with actual or constructive

knowledge, and (3) a constitutional violation whose moving force is that policy (or

custom).'" *Hutcheson*, 994 F.3d at 482 (quoting *Pineda v. City of Hous.*, 291 F.3d 325,

328 (5th Cir. 2002)).

On the other hand, "[a] 'condition of confinement' case is a constitutional attack

on 'general conditions, practices, rules, or restrictions of pretrial confinement'" that

"'amount to punishment of the detainee.'" *Est. of Bonilla v. Orange Cnty., Tex.*, 982

F.3d 298, 308 (5th Cir. 2020) (quoting *Flores*, 124 F.3d at 738, then *Garza v. City of

Donna*, 922 F.3d 626, 632 (5th Cir. 2019)).

"To state a conditions-of-confinement claim, a plaintiff must allege (1) 'a rule

or restriction or ... the existence of an identifiable intended condition or practice ...

[or] that the jail official's acts or omissions were sufficiently extended or pervasive;

(2) which was not reasonably related to a legitimate governmental objective; and (3)

which caused the violation of [the inmate's] constitutional rights.'" *Martinez*, 846 F.

App'x at 247 (quoting *Henson*, 795 F.3d at 468).

"In other words, 'the conditions themselves constitute the harm,' regardless of

any individual's act or omission." *Cope II*, 2024 WL 3177781, at *8 (quoting *Scott v.

Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc); footnote omitted).

So, in "conditions cases, the [policies alleged] impose 'durable restraints or impositions on inmates' lives' that transcend a single act or omission by an officer." *Id.* at *9 (quoting *Garza*, 922 F.3d at 633); *see, e.g.*, *Garza*, 922 F.3d at 633-34 ("Prior conditions cases have concerned durable restraints or impositions on inmates' lives like overcrowding, deprivation of phone or mail privileges, the use of disciplinary segregation, or excessive heat." (citing *Yates v. Collier*, 868 F.3d 354, 360 (5th Cir. 2017); *Scott*, 114 F.3d at 53 & n.2)).

And, in such cases, even if only a single detainee is harmed, "the alleged cause of the harm is the broader 'conditions, practices, rules, or restrictions.'" *Cope II*, 2024 WL 3177781, at *8 (quoting *Sanchez II*, 956 F.3d at 791).

> [By contrast, i]n an episodic-act-or-omission case against a municipality, "an actor is usually interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Flores*, 124 F.3d at 738. To succeed in holding [a municipality] liable, [plaintiffs] must demonstrate an employee's subjective indifference and additionally that the employee's act "resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference to her constitutional rights." *Hare*, 74 F.3d at 649 n.14.

*Martinez*, 846 F. App'x at 247.

Following *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), "this circuit has continued to apply a subjective deliberate indifference standard in non-excessive-force actions alleging a violation of a pretrial detainee's constitutional rights based on episodic acts or omissions." *Cope II*, 2024 WL 3177781, at *5 n.7 (citing *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 & n.4 (5th Cir. 2017) (per curiam)); *see also Edmiston v. Borrego*, 75 F.4th 551, 558-59 (5th Cir. 2023) ("Where the claimed

violation of that Fourteenth Amendment right turns on alleged acts or omissions of an official, … the question is whether the official breached his constitutional duty to tend to the basic human needs of persons in his charge.… [T]o satisfy this high standard, plaintiff must plausibly allege both that the official was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and that he also drew the inference. An official with such knowledge shows a deliberate indifference to that risk by failing to take reasonable measures to abate it." (cleaned up)); *Rangel v. Wellpath, LLC*, No. 5:23-cv-128-H, 2024 WL 1160913, at *13 (N.D. Tex. Mar. 18, 2024) ("Under an episodic-acts-or-omissions theory, 'a plaintiff must show (1) that the municipal employee violated [the pretrial detainee's] clearly established constitutional rights with subjective deliberate indifference; and (2) that this violation resulted from a municipal policy or custom adopted and maintained with objective deliberate indifference.'" (cleaned up; quoting *Cadena v. El Paso Cnty.*, 946 F.3d 717, 727 (5th Cir. 2020))).

Although Plaintiffs insist that "[t]his is a conditions-of-confinement case for which no finding of deliberate indifference is required" and that they pleaded "episodic acts or omissions claims only in the alternative," Dkt. No. 35 at 18 (modified), the two theories still share many of the same elements.

> [And t]he Fifth Circuit has observed that "[it] see[s] no meaningful difference between the[ ] showings" of a policy under a *Monell* theory and a condition under a conditions-of-confinement theory. *Bonilla*, 982 F.3d at 308 (quoting *Duvall v. Dall. Cnty.*, 631 F.3d 203, 208 (5th Cir. 2011)). Similarly, the "moving force" standard of causation, which requires a "direct causal link" and "more than ... mere 'but for'" causation, "appears to be the same" for *Monell* and conditions-of-confinement claims. *See id.* at 308, 311-12. The key difference is that a

> *Monell* claim requires the plaintiff to show that the "municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Valle v. City of Hous.*, 613 F.3d 536, 542 (5th Cir. 2010) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 411 (1997)). In contrast, a conditions-of-confinement claim does not require the plaintiff to show that the municipality was deliberately indifferent in promulgating the condition. *Duvall*, 631 F.3d at 207.

*Rangel*, 2024 WL 1160913, at *6 (citations modified).

But, while deliberate indifference is not an element of a conditions-of-confinement claim, a plaintiff still must allege that "the conditions 'amount to punishment.'" *Sanchez II*, 956 F.3d at 791 (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). That is, "[b]ecause a state may not punish a pretrial detainee, conditions of confinement for such an inmate that amount to 'punishment' violate the Constitution." *Duvall*, 641 F.3d at 206.

"If a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment." *Bell*, 441 at 539.

But, "[i]f Plaintiffs can show the conditions at issue are not reasonably related to a legitimate government objective, the court 'permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.'" *Cope II*, 2024 WL 3177781, at *9 n.16 (quoting *Bell*, 441 U.S. at 539; citation omitted); *see also Kingsley*, 576 U.S. at 398 ("*Bell*'s focus on 'punishment' does not mean that proof of intent (or motive) to punish is required for a pretrial detainee to prevail on a claim that his due process rights were violated. Rather, as *Bell* itself shows (and as our later precedent affirms), a

- 13 -

pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." (citations omitted)). *Cf. Rangel*, 2024 WL 1160913, at *13 ("The Court also notes that the plaintiff has not alleged or argued that any of the identified policies are not reasonably related to a legitimate government objective." (citation omitted)).

So, again, while "a plaintiff must show deliberate indifference on the part of the municipality only in a case in which the constitutional violation resulted from an episodic act or omission of a state actor," *Duvall*, 641 F.3d at 207 (citing *Hare*, 74 F.3d at 644), where a plaintiff alleges "unconstitutional conditions of confinement, the plaintiff [still must] show that such a condition, which is alleged to be the cause of a constitutional violation, has no reasonable relationship to a legitimate governmental interest," *id*. That is, "the condition must be one that is 'arbitrary or purposeless' or, put differently, 'not reasonably related to a legitimate goal.'" *Shepherd v. Dall. Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009) (quoting *Bell*, 441 U.S. at 539).

The applicable framework set out, the Court should preliminarily consider the relationship between the County and CorrHealth. And the undersigned notes that a Texas municipality "may still be held liable under Section 1983" where it contracts a for-profit company to provide medical care for pretrial detainees. *Rangel*, 2024 WL 1160913, at *10-*11 (rejecting at the pleadings stage the notion that a "policy is not a Lubbock County policy due to the contractual relationships between the County and Wellpath" (citing *Rodriguez v. S. Health Partners, Inc.*, No. 3:20-cv-45-D, 2020 WL

7056336, at *13 (N.D. Tex. Dec. 2, 2020))).

> As the court in *Rangel* explained, the United States Supreme Court
>
> > has indicated that "there will be cases in which policymaking responsibility is shared among more than one official or body." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988). And if "a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, [Section] 1983 could not serve its intended purpose." *Id.* Thus, courts in this district have concluded that a county's delegation of policymaking authority to a private healthcare provider does not necessarily preclude the county from liability under Section 1983. *Rodriguez*, 2020 WL 7056336, at *13.
> >
> > At the very least, the plaintiff's allegations provide "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" that the Sheriff had actual or constructive knowledge of the mental-health personnel staffing policies. *See In re S. Scrap Material Co.*, 541 F.3d 584, 587 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). Thus, the Court concludes that the plaintiff has sufficiently alleged that the municipal policymaker promulgated and had actual or constructive knowledge of the [alleged] policy.

*Rangel*, 2024 WL 1160913, at *10-*11.

The undersigned now applies the applicable framework to Plaintiffs' allegations that the County is liable under a conditions-of-confinement theory.

As another judge in this district recently put it, "[i]n the Fifth Circuit, a 'condition' may be a 'rule,' a 'restriction,' 'an identifiable intended condition or practice,' or 'acts or omissions' by staff members that are 'sufficiently extended or pervasive.'" *Alexander v. S. Health Partners, Inc.*, No. 3:22-cv-395-X, 2024 WL 3240652, at *4 (N.D. Tex. June 28, 2024) (cleaned up; quoting *Henson*, 795 F.3d at 468).

In addition to alleging that the condition is arbitrary, purposeless, or not reasonably related to a legitimate objective – or, as the court in *Alexander* characterized this element: the condition is an "improper fit," *id.* – a plaintiff must

allege that the condition constitutes 'a serious deficienc[y] in providing for [detainees'] basic human needs' because 'any lesser showing cannot prove punishment in violation of the detainee's Due Process rights,'" *id.* (quoting *Shepherd*, 591 F.3d at 454), and that the condition "'cause[d]' the constitutional deprivation," *id.* (quoting *Garza*, 922 F.3d at 633); *see, e.g.*, *Garza*, 922 F.3d at 631 & 633-34 (affirming the rejection at summary judgment of a conditions theory based on signs posted at the jail that plaintiffs argued invoked torture or encouraged vigilante justice, observing that "[t]he import of the Donna jail's signs is too nebulous to amount to an official rule or restriction, and the signs do not operate as a continuing burden on inmate life in the way that dangerously high temperatures or overcrowded cells do").

At times, the conditions alleged to be unconstitutional punishment are specifically explicit. *See, e.g.*, *Alexander*, 2024 WL 3240652, at *3 ("Alexander pleads that he 'was harmed by being subjected to the conditions inherent to the violent cell under the express policies of the jail, such as complete isolation, 24-hour bright lighting, a total lack of bedding, and no access to a toilet, shower, sink, or running water of any kind.'"); *Bonnet-Pritchett v. Washington Cnty., Tex.*, 1:12-CV-149-RP, 2023 WL 8421180, at *2 (W.D. Tex. Dec. 4, 2023) ("Plaintiffs allege that Washington County allowed [detainees] to hang blankets over their cells to prevent jail staff from viewing inside"; that decedent detainee "'committed suicide at a time when he was allowed, by Washington County, policy, practice, and/or custom, to block jailer's view of him with a blanket'"; and that, relatedly, "jail staff failed to properly monitor inmates via face-to-face observation because they allowed jail cell coverings"

(citations omitted)).

The alleged conditions need not be as specific as the above examples. "Nevertheless, succeeding on a conditions-of-confinement claim is more difficult when that claim rests upon an alleged de facto, rather than explicit, policy." *Brooks v. Taylor Cnty.*, No. 1:20-cv-49-H, 2021 WL 4458380, at \*24 (N.D. Tex. Sept. 29, 2021). And, while the present focus is plausible allegations, "[a] plaintiff may establish a de facto policy by presenting evidence such as commissioned reports, consistent employee testimony, or other documentary evidence indicating inmates received 'grossly inadequate' treatment." *Id.* (cleaned up). And, when "multiple employees act in the same unconstitutional manner, that is indicative of a de facto [municipal] policy." *Id.* (citation omitted).

And, in this circuit, a plaintiff need not "show that a 'policy or practice [was] the exclusive cause of the constitutional deprivation,'" so [c]ourts 'may ... consider how individual policies or practices interact with one another within the larger system.'" *Sanchez II*, 956 F.3d at 795 (emphasis omitted; quoting *M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 254, 255 (5th Cir. 2018)). "This is because confinement conditions may be constitutionally inadequate if, when viewed in combination, they have a 'mutually enforcing effect that produces the deprivation of a single, identifiable human need.'" *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)).

Here, Plaintiffs' theory that the County is liable is that Maxwell's constitutional rights were violated through conditions that caused him to receive

cursory medical care. *Cf. Ford*, 102 F.4th at 308 n.7 (observing in the context of an episodic-acts-or-omissions claim that "[r]esponding to a serious medical issue with such a cursory level of care may still constitute deliberate indifference" (collecting cases)).

And Plaintiffs mainly allege that the failure to provide emergency or necessary medical care and the failure to adequately monitor detainees and communicate as to their health conditions are the conditions (1) that are not reasonably related to, or excessive in relation to, a legitimate government objective – and thus amount to unconstitutional punishment of pretrial detainees at the jail (2) that caused – or were the moving force behind – Maxwell's death:

> Wichita County or CorrHealth or both failed to provide or delayed providing medical treatment to detainees.
> Wichita County or CorrHealth or both, while knowing that detainees needed immediate emergency medical care, would continue incarcerating such detainees in lieu of obtaining needed care.
> Wichita County or CorrHealth or both failed to act to address observed serious health issues while monitoring detainees. This was in part an effort to save costs.
> Wichita County or CorrHealth or both employees would not respond, or respond appropriately, when detainees suffered from serious medical or mental health issues that were visible and apparent through the video feed of a detainee's cell. In the alternative, Wichita County or CorrHealth or both ignored video feeds even for detainees with serious medical or mental health issues.
> CorrHealth would not respond to a detainee's cell for an evaluation and subsequent emergency medical treatment, if determined to be necessary, when a jailer called for a medical emergency.
> Wichita County or CorrHealth or both would try to save Wichita County or CorrHealth money, by failing or refusing to transport detainees who vitally needed emergency medical care to a local emergency room.
> Wichita County and CorrHealth would only contact emergency medical services or transport a person to a local hospital if the person appeared to be near death or had become nonresponsive.

Upon information and belief, CorrHealth incentivized its employees or alleged independent contractors through payment of bonuses or provision of other benefits for saving expenditures on medical or mental health services by limiting transports of jail detainees to local hospitals, among other things.

Upon information and belief, Wichita County or CorrHealth or both treated detainees without apparent health insurance differently than those with it. Upon information and belief, CorrHealth personnel participated in and medically cleared Matthew for incarceration in the County jail on March 28, 2022. As part of the process, Matthew signed a form document for Texas Health and Human Services entitled "Application for Health Care Assistance" which indicated that Matthew had no money in his commissary or jail account and that Matthew had not worked in the three prior months. Upon information and belief, this was a form whereby Matthew could potentially obtain governmental assistance for healthcare he needed while incarcerated in the jail. Thus, Defendants were aware that Matthew apparently had no health insurance that would cover any treatment he received, including needed medical treatment at a local hospital.

…

Wichita County or CorrHealth or both failed to monitor detainees or in the alternative failed to adequately or effectively monitor detainees.

…

Upon information and belief, Wichita County or CorrHealth or both may not have appropriately communicated a detainee's serious medical needs from one shift to another through appropriate pass down notes, logs, or meetings. In this case, the decedent's issues were obvious near the end of one shift and continued through hours of suffering and death during another shift.

Dkt. No. 19, ¶ 78; *see also* Dkt. No. 35 at 22-28.

Elsewhere in the amended complaint, Plaintiffs allege that the County, through its agreement with CorrHealth, aims to reduce costs, including off-site transports for medical care, and that this cost consciousness contributed to the treatment that Maxwell received (or failed to receive) while detained at the jail:

CorrHealth's website provides numerous testimonials by employees of various counties regarding its provision of services. The chief deputy of one Texas county wrote that he appreciated the lengths CorrHealth goes to in an effort to reduce Jefferson County's costs. …

CorrHealth also advertises on its website statements made by a retired lieutenant of a detention center in another Texas county. He wrote that unnecessary medical-related transports to hospitals are labor and time-intensive, costly, and increase risks and liabilities. He further wrote that decreasing those transports was a prime focal point for that county when selecting its healthcare provider and that CorrHealth's leadership presented creative solutions to reduce those transports. He stated that, within 12 hours of the transition to CorrHealth, CorrHealth policies resulted in three people not being transported to a hospital who would have been transported to a hospital by the previous medical services provider. CorrHealth states on its website, "While we understand off-site transports will still be delivered to those requiring additional attention, we aim to limit these transports as much as possible." CorrHealth promises to save counties money.

…

CorrHealth also advertises: "CorrHealth's programs and services are designed to maximize on-site programs and services, reduce inmate movement and decrease costly, risk-laden, offsite medical-related transports." And, "CorrHealth partners with our counties to assist them in reducing overall costs and mitigate risk and liability. By reducing off-site transports and maximizing on-site services as well as by providing ongoing support and additional training for our qualified health care teams, [CorrHealth] ensure[s]that the goals of the county are a priority as part of our partnership." Explicitly and implicitly, CorrHealth signals its intent to reduce hospital transports. This resulted in Matthew's horrific suffering and death.

Plaintiff's counsel was unable to obtain the inmate healthcare services agreement between the County and CorrHealth. However, upon information and belief, the agreement between the County and CorrHealth was substantially or materially the same as that between Jefferson County, Texas and CorrHealth commencing in April 2018. Upon information and belief, CorrHealth's written contracts with various counties across Texas contain substantially similar material terms.

Dkt. No. 19, ¶¶ 57, 58, 60, 61.

In Plaintiffs' view, Maxwell suffered under these policies (or conditions). As

they put it on reply,

[w]hen Corporal Price demanded CorrHealth provide emergency treatment to Matthew, a CorrHealth nurse responded that, according to higher-level or management CorrHealth employees, jailers could not threaten to call a medical emergency to get medical care for a detainee.

- 20 -

> ([Dkt. No. 19,] ¶ 18) And after Price took Matthew to Medical himself, CorrHealth still refused to provide emergency or other necessary medical care. Defendants knew that Matthew apparently had no health insurance to cover treatment, including needed medical treatment at a local hospital. ([*id.*,] ¶ 78)

Dkt. No. 35 at 24.

Adding to this, Plaintiffs further allege that the failure to adequately monitor inmates and the failure to communicate regarding inmates' care are de facto policies of the County that, in combination with the conditions alleged above, amount to unconstitutional punishment of pretrial detainees that violated Maxwell's rights. *See, e.g.*, *id.* at 25-31 (citing portions of the amended complaint where the allegations are based on Texas Commission on Jail Standards reports, prior inmate deaths, and positive well-being-check entries as to Maxwell that were formulaic and that continued after his death).

The undersigned stresses that, at this stage, the Court must accept Plaintiffs' plausibly pleaded allegations. And the conditions at issue are plausibly pleaded.

That is because the facts in the amended complaint allow the Court to reasonably infer the existence of these conditions. And the determination of whether evidence will ultimately support their existence – or refute Plaintiffs' allegations – must be left to a subsequent stage of this proceeding.

Put another way, as to the existence of conditions at the jail that amount to unconstitutional punishment of pretrial detainees that allegedly caused Maxwell's death, Plaintiffs point to facts that reveal more than "random puffs of smoke" and more than episodic acts or omissions – so, under a conditions-of-confinement theory of liability, this lawsuit should proceed to discovering if there truly is (or was) a "fire,"

as Plaintiffs allege. *Parker*, 935 F.3d at 17.

The undersigned further finds that, as to these alleged conditions, Plaintiffs have carried their burden to plausibly plead that the conditions are not reasonably related to a legitimate governmental interest.

As to the alleged condition to avoid medical transports or medical care outside of the jail, to save costs, it may eventually be shown not to be unconstitutional, as punishment of a pretrial detainee. But, at this stage, it is plausibly alleged that these cost-saving measures are at least excessive in relation to a governmental objective – to the extent that budget consciousness is a legitimate government goal, a matter that the County (as the movant) did not adequately brief.

And, while the failure to provide emergency or necessary medical care may, in isolation, seem to be too general or too conclusory, where Plaintiffs also allege facts from which the Court may infer that this failure – this condition – was the result of business decisions by the jail's medical provider, the condition is not – at the pleadings stage – "too nebulous to amount to an official rule or restriction." *Garza*, 922 F.3d at 634.

In sum, the motion should be denied because Plaintiffs' amended complaint contains enough plausible allegations, accepted as true, to "permit a reasonable inference" as to the existence of unconstitutional conditions of confinement at the County's jail that are not reasonably related to a legitimate governmental objective and that caused harm to Maxwell, such that the County has not carried its burden to show that, "even in [Plaintiffs'] best-case scenario, the [amended] complaint does not

state a plausible case for relief." *Sewell*, 974 F.3d at 581.

## Recommendation

The Court should deny Defendant Wichita County, Texas's motion to dismiss the claims against it in Plaintiffs' First Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) [Dkt. No. 27].

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: July 31, 2024

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE